**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LISA BROKENBOROUGH
9412 Firtree Park St.
Capitol Heights, MD 20743

ZENAIDA MASSEY
3900 Wheeler Rd. SE
Washington, DC 20032

MICHELLE MURRAY
2010 Bruce Pl. SE
Washington, DC 20020

BEVERLY RICHARDSON
4413 Arnold Rd., #103
Suitland, MD 20746

CHARNITA THOMAS
503 Treehouse Ct.
Fort Washington, MD 20744

*and*

JOYCE WEBB-BRIDGES
5746 East Bonniwood Turn
Clinton, MD 20735

     *Plaintiffs*

          vs.

The DISTRICT OF COLUMBIA
441 4th Street, NW
Washington, DC 20001


*and*

JOSEPH PETTIFORD
District of Columbia Department of
     Corrections
2000 14th Street NW
Washington, DC 20009

     *Defendants.*

Case No.: 1:13-cv-1757




**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

This is a lawsuit to remedy the shocking, outrageous, and rampant practice of sexual harassment, retaliation, and related abuses at the District of Columbia Department of Corrections ("DOC").  Female employees are regularly confronted with the kind of sexual obscenities and lewd gestures that hearken back to the workplace of the 1950s.  Male supervisors openly leer at, demand sex from, and expose themselves to female employees.  Women who do not acquiesce suffer retaliation: they are passed over for promotions, switched to dangerous or undesirable posts, or subjected to unusually harsh discipline, including termination.  Women brave enough to stand up to the humiliation and abuse face a hostile, confusing, and futile complaint process that thwarts their efforts to secure relief at every turn.

For decades, the DOC has been on notice of the egregious harassment that takes place within its walls, yet it has not rectified the wrongs suffered by its female employees.  Instead, it has tolerated, condoned, supported, and rewarded those who engage in sexual harassment of the worst sort.  This lawsuit seeks to ensure that female employees at the DOC can perform their duties with dignity, free from fear and humiliation, by achieving what individual women and lawsuits have thus far been unable to achieve: the end of sexual harassment at the DOC.

## I.      NATURE OF THE ACTION

1.      Plaintiffs file this action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("§ 1983"), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.01 *et seq.* for redress of injuries suffered due to a long-standing and pervasive practice of sex discrimination, sexual harassment, and the creation of a hostile work environment committed by the DOC and Joseph Pettiford ("Defendants") against Lisa Brokenborough, Zenaida Massey,

Michelle Murray, Beverly Richardson, Charnita Thomas, and Joyce Webb-Bridges ("Plaintiffs") and other female employees of the DOC.  Moreover, Defendants regularly retaliate against employees who oppose or report such unlawful employment practices and have displayed deliberate indifference to employees' complaints of harassment by insufficiently investigating their claims and by protecting and promoting individuals who perpetrate such harassment.  These violations are systemic in nature, constituting a custom or policy of harassment and retaliation that has occurred for decades and continues to the present day.  Accordingly, Plaintiffs seek declaratory, equitable, and monetary relief.

## II.   JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over Counts I-V because they arise under the United States Constitution and federal statutes pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Counts VI-VIII pursuant to 28 U.S.C. § 1367 because those claims arise from a common set of operative facts and are so related to the claims in the action within the original jurisdiction of the Court that they form part of the same case or controversy.  Jurisdiction to grant a declaratory judgment is conferred by 28 U.S.C. §§ 2201-02.

3.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because all of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Columbia.

## III.   PARTIES

4.    Plaintiff Lisa Brokenborough is a female corrections officer at the DOC and resides in Maryland.  Ms. Brokenborough has been a DOC employee since 1985, with a break in service from 1997-2007.

5.    Plaintiff Zenaida Massey is a female former corrections officer at the DOC and resides in the District of Columbia.  She was a DOC employee between February 2008 and December 2012.

6. Plaintiff Michelle Murray is a female former corrections officer at the DOC and resides in the District of Columbia. She was a DOC employee from June 30, 2008 through April 9, 2014.

7. Plaintiff Beverly Richardson is a female former corrections officer at the DOC and resides in Maryland. She was a DOC employee from September 21, 2009 through December 2, 2013.

8. Plaintiff Charnita Thomas is a female corrections officer at the DOC and resides in Maryland. She has been a DOC employee since November 13, 2006.

9. Plaintiff Joyce Webb-Bridges is a female corrections officer at the DOC and resides in Maryland. Ms. Webb-Bridges has been a DOC employee since November 2, 1981, with a break in service from October 2000 through January 2006.

10. Defendant, the District of Columbia ("D.C."), is a municipal corporation. The District of Columbia is liable under 42 U.S.C. § 1983 because a custom or policy of the municipality caused the violations of Plaintiffs' constitutional rights. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). The DOC is an agency of the District of Columbia. *See* D.C. Code §§ 24-211.01-211.02. The DOC operates the Central Detention Facility (the "D.C. Jail") and contracts with private entities to operate the Correctional Treatment Facility and four halfway houses. The DOC employs approximately 900 persons, several hundred of whom are female. Director Thomas Faust oversees all operations of the DOC. He is responsible for the policies and practices of the DOC. Upon information and belief, Director Faust was aware or should have been aware of sexual harassment and retaliation at the DOC, and knowingly failed to act to stop the abuse.

11.     Defendant Joseph Pettiford is a Major and former Deputy Warden at the DOC. Defendant Pettiford became an employee of the DOC in October 1994.  Defendant Pettiford personally participated in many of the acts complained of in this litigation.  He was promoted to Deputy Warden in March of 2013, and assumed the position of Major again in or around September or October of 2013.  Upon information and belief, as both Major and Deputy Warden, he has served as part of the DOC's senior management, with responsibilities that include managing personnel, assignments, discipline, and terminations; preparing and implementing directives; and managing programming and discipline of the inmate population.  He also influenced hiring decisions.  He is sued in his individual capacity.  During all times mentioned in this Complaint, Defendant Pettiford acted under color of District of Columbia law.

## IV.    FACTUAL ALLEGATIONS

### A.    History of Sexual Harassment and Retaliation at the DOC

12.     The DOC has a long and sordid history of engaging in, permitting, and condoning sexual harassment against female employees, and retaliating against individuals who oppose or report of harassment.

13.     As far back as 1979, this Court made an express finding of fact that making improper sexual advances to female employees at the DOC was "standard operating procedure, a fact of life, a normal condition of employment."  *See Bundy v. Jackson*, 641 F.2d 934, 939 (D.C. Cir. 1981).

14.     In 1981, the Court issued an injunction prohibiting the DOC from "causing, encouraging, condoning, or permitting the practice of sexual harassment of female employees by male supervisors and employees within the Department," and requiring the DOC to take certain corrective measures.  *Bundy v. Jackson*, No. 78-1359, 1981 WL 146, at *1 (D.D.C. Mar. 23, 1981).

15.     Notwithstanding the Court's injunction, rampant sexual harassment at the DOC continued "openly and wantonly." *See Neal v. Director, Dist. of Columbia Dep't of Corr.*, No. 93-2420, 1995 WL 517244, at *2 (D.D.C. Aug. 9, 1995).

16.     In 1994, eight DOC employees brought a class action against the District of Columbia and the Director of the DOC at the time, alleging a pattern and practice and an unwritten custom or policy of implicit and explicit *quid pro quo* sexual harassment against female DOC employees, a sexually hostile work environment, and retaliation against employees who opposed the harassment. *See Neal v. Director, D.C. Dept. of Corrections*, No. 93-2420 (D.D.C. Jan. 5, 1994).

17.     The *Neal* class alleged that female employees were subjected to demands for sex in exchange for favorable work assignments, disciplinary leniency, or other benefits; that women who acquiesced to such demands were shown favoritism in promotions and other conditions of employment; that the offensive and sexual conduct of supervisors and co-workers, including kissing, pinching, grabbing, and pressure to engage in sexual relations, constituted a hostile work environment; and that individuals who reported or opposed the hostile work environment and sexual harassment were routinely retaliated against in the form of, *inter alia*, denials of promotions, unfavorable posts and shifts, and unwarranted discipline. *See Neal v. Director, D.C. Dept. of Corrections*, No. 93-2420 (D.D.C. Jan. 5, 1994).

18.     The presiding judge, Honorable Royce C. Lamberth, described the *Neal* case as "extraordinary" because the defendants "repeatedly committed acts of retaliation against the class agents *while the case was pending*." *Neal v. Director, D.C. Dep't of Corrections*, No. 93-2420, 1995 WL 517248, at *2 (D.D.C. Aug. 9, 1995) (emphasis added). A jury trial commenced

on March 1, 1995 before Judge Lamberth and resulted in a judgment and verdict for the *Neal* plaintiff class.

19.     On appeal, however, the U.S. Court of Appeals for the District of Columbia Circuit vacated the judgment after finding error with the discovery sanction imposed on the DOC, and remanded the case for a new trial.  The Court of Appeals did so "reluctantly because sexual harassment is a long-standing problem at the Department of Corrections," and after recognizing that "while discovery was ongoing Department employees engaged in retaliatory conduct." *Bonds v. Dist. of Columbia*, 93 F.3d 801, 804, 812 (D.C. Cir. 1996) (citing *Bundy v. Jackson*, 641 F.2d 934 (D.C. Cir. 1981)).

20.     Instead of retrying the case, the parties reached a settlement and agreed to a consent decree on August 28, 1997 that included both monetary and equitable relief for the class. Among other relief, the consent decree established an independent, court-appointed Office of the Special Inspector with authority over all sexual harassment and retaliation complaints at the DOC — including the authority to hire necessary staff, investigate complaints, issue findings, discipline employees, and provide corrective personnel actions and back pay to prevailing complainants.  The consent decree also required the DOC to establish and implement, in conjunction with the Special Inspector, policies and procedures and training programs regarding sexual harassment, and prohibited the DOC from engaging in, or "knowingly permit[ting] a pattern or practice of sexual harassment or retaliation against any employee for opposing sexual harassment."

21.     When the parties sought approval of the settlement, Judge Lamberth evaluated the consent decree against what he described as the "reality of sexual harassment at [the DOC] . . . over the last three decades": a "persistent and pervasive culture of implicit and explicit *quid pro*

*quo* sexual harassment"; "a work environment as sexually hostile as one can imagine"; and "a crescendo of retaliation against those employees who opposed sexual harassment." On June 28, 1999, Judge Lamberth granted final approval of the consent decree and expressed the "hope and expectation that the relief provided for in the consent decree" would help the DOC "achieve true institutional change."

22.     The *Neal* consent decree, and the Court's supervision over the Office of the Special Investigator, expired on February 4, 2004. The Court dismissed the action from the docket on January 24, 2007.

**B.     Sexual Harassment and Retaliation at the DOC Today**

23.     Unfortunately, the conduct that gave rise to the *Neal* class action litigation continues at the DOC today.

24.     As set forth in the paragraphs below, Plaintiffs and numerous other female DOC employees are still routinely subjected to *quid pro quo* sexual harassment, a sexually charged and emotionally abusive hostile work environment, and retaliation for rejecting the sexual advances of their supervisors or opposing such unlawful practices through protected EEO activity. The conduct is so severe and pervasive that it has altered the conditions of employment for women at the DOC. Sexual harassment and retaliation, as well as the DOC's indifference to and active concealment of complaints of harassment, remain the custom and standard operating procedure at the DOC.

Lisa Brokenborough

25.     Plaintiff Lisa Brokenborough worked at the DOC from November 25, 1985 to November 17, 1997 as a corrections officer. Ms. Brokenborough was a claimant in *Neal v. Director, D.C. Dept. of Corrections*, No. 93-2420 (D.D.C. Jan. 5, 1994).

26.     After an extended medical leave beginning in 1997, Plaintiff Brokenborough was rehired on February 3, 2008 and has been continuously working at the DOC since.

27.     From 2007 to present, Defendant Pettiford was Ms. Brokenborough's fourth level direct supervisor.  As such, Defendant Pettiford had authority to assign Ms. Brokenborough's shifts and posts.  Defendant Pettiford sits with other officers on a panel that assigns posts.  He also had the authority to discipline or terminate her.

28.     In or about February and March of 2008, Defendant Pettiford stopped Ms. Brokenborough after morning roll call and made a sexual comment about Ms. Brokenborough's breasts.

29.     Defendant Pettiford made repeated sexual remarks to Ms. Brokenborough as often as once or twice per week before or after morning roll call. These statements included, "I want to touch your breasts," "I want to feel your twins" (*i.e.*, breasts), and "Your lipstick is looking good today."

30.     Within one month, Defendant Pettiford's actions intensified.  Defendant Pettiford began propositioning Ms. Brokenborough for sexual favors and sexual intercourse.  In the fall of 2008, Defendant Pettiford called Ms. Brokenborough to his office and stated that he could promote Ms. Brokenborough to Sergeant without her having to take the requisite test if she would sleep with him.  Ms. Brokenborough refused his advance.  In this instance and others, Defendant Pettiford called Ms. Brokenborough "Sergeant Wellington" (Ms. Brokenborough's married name at the time) as he made requests for sexual favors.

31.     In November 2008, after Ms. Brokenborough rebuffed Defendant Pettiford's advances, Ms. Brokenborough took and passed the written Sergeant's exam.  However, she was never placed on the list for the in-person interview portion of the application process which

should follow automatically for those who pass the written exam.  Upon information and belief, Defendant Pettiford, who was close friends with then-Deputy Director Patricia Jackson-Britton, interfered with Ms. Brokenborough's application and prevented her from the promotion to Sergeant, causing financial and emotional loss.

32.     From 2009 through 2012, Defendant Pettiford regularly called Ms. Brokenborough to his office, ostensibly to discuss work assignments.  When Ms. Brokenborough would come to his office, Defendant Pettiford habitually offered professional advancements and favorable assignments to Ms. Brokenborough if she would sleep with him or perform other sexual acts.  Defendant Pettiford made these requests as often as once per month.

33.     In addition to offering professional advancement in exchange for sex, Defendant Pettiford regularly made statements such as, "We could close the door and do it here," "Let me see your breasts," "Nobody can get in my office — let me see," "I want to f*ck you," or "Show me your teddies" (*i.e.*, breasts).  Ms. Brokenborough felt frightened and threatened during these incidents and feared that Defendant Pettiford would terminate her.

34.     Since 2008, Ms. Brokenborough has sought promotion on at least six other occasions and each time, she has been denied promotion despite having adequate seniority and passing the requisite exam.  Other officers who had taken and passed the Sergeant's exam at the same time as Ms. Brokenborough continued to be promoted through mid-2012.  When the Sergeant's exam was offered again in the fall of 2012, Defendants failed to provide Ms. Brokenborough adequate notice of the exam, precluding her from even applying to sit for the exam.  Upon information and belief, Defendant Pettiford sits on a panel with oversight over promotion proceedings and has continued to interfere with Ms. Brokenborough's advancement opportunities in retaliation for her rebuffing his sexual advances.

35.     On July 3, 2012, Defendant Pettiford's actions escalated.  Defendant Pettiford asked Ms. Brokenborough to come to his office.  When she arrived, Defendant Pettiford closed the door, pulled out his penis, and instructed Ms. Brokenborough to "suck [him]" (*i.e.*, perform oral sex).  Ms. Brokenborough informed Defendant Pettiford that his actions were inappropriate.  Defendant Pettiford then asked to see her breasts.  When Ms. Brokenborough refused, Defendant Pettiford masturbated and ejaculated in Ms. Brokenborough's presence, handing her the napkin which contained his ejaculate.  Ms. Brokenborough did not leave the office due to her shock and because she feared for her safety.  Frightened and upset, she went to her car during her lunch break and cried.

36.     Approximately nine days later, Ms. Brokenborough told Luarrine Ellis, Executive Secretary of her union, the Fraternal Order of Police ("FOP"), and Corporal Judy Brown about the incident.  They both encouraged Ms. Brokenborough to report the event.

37.     Within weeks of the incident, Ms. Brokenborough called the sexual harassment hotline, where she was directed to notify the Director's office.  Then-Director Devon Brown's secretary directed her to DOC's internal EEO counselor and Human Rights manager at the time, Mitchell Franks, but Mr. Franks never met with Ms. Brokenborough.  Ms. Brokenborough felt she was getting the run-around, so she contacted Sergeant Deon Jones, who is knowledgeable of DOC administrative procedures.  Mr. Jones suggested that Ms. Brokenborough contact PREEMPT Corp. ("PREEMPT"), the third-party company contracted by the DOC to investigate complaints of sexual harassment.  On August 6, 2012, Ms. Brokenborough reported the incident to Wanda Johnson, PREEMPT's President and Chief Executive Officer.

38.     Upon information and belief, Defendants have retaliated against Ms. Brokenborough's son, Stephon Oliver, also a corrections officer, for Ms. Brokenborough's

refusal to acquiesce to Defendant Pettiford's demands.  On July 10, 2012, only days after

Defendant Pettiford exposed himself to Ms. Brokenborough and she rejected his advance,

Defendant Pettiford suspended Mr. Oliver for at least five days without pay ostensibly for

insubordination and malfeasance.  Mr. Oliver fought the suspension.  It was subsequently

determined that he had not been insubordinate and he was given back pay.  In addition, since Ms.

Brokenborough reported the incident, Defendants have switched Mr. Oliver's shifts more

frequently, have not been granting him leave, and have disciplined him more frequently and

severely than other officers.

39.     A Cease and Desist Order was issued to Ms. Brokenborough and Defendant

Pettiford on August 23, 2012, ordering them to avoid all unnecessary contact with each other

while Ms. Brokenborough's allegations were investigated.  Nevertheless, Ms. Brokenborough is

forced to interact with Defendant Pettiford on a regular basis.

40.     On the day the Cease and Desist Order was issued, Defendant Pettiford

approached Ms. Brokenborough while she was waiting for an elevator, touched her lower back

and stated, "You saw me right there."  Ms. Brokenborough interpreted Defendant Pettiford's

actions as sexual and intimidating.

41.     On October 24, 2012, PREEMPT notified Ms. Brokenborough that they

completed their investigation, finding that she failed to provide sufficient evidence to establish

that Defendant Pettiford harassed her.  At that time, however, all investigations by PREEMPT

had been suspended due to "pending FY 2013 budgetary processes."

42.     Since reporting the harassment, Ms. Brokenborough has also been denied (and

continues to be denied) overtime hours.  Whereas she habitually received up to thirty overtime

hours before she reported the harassment, her hours have decreased dramatically after she filed

her complaint.  According to Ms. Brokenborough, overtime hours are supposed to be distributed on a first-come-first-served system, where employees are awarded overtime opportunities in the order they sign up for them.  However, Ms. Brokenborough regularly observes when she is passed over for these opportunities that some employees receive overtime hours even when they signed up after Ms. Brokenborough or did not sign up at all.

43.     On November 19, 2012, Ms. Brokenborough contacted the EEO counselor for the Metropolitan Police Department and received notice of her right to file a charge with the D.C. Office of Human Rights ("DCOHR").

44.     On January 14, 2013, Ms. Brokenborough filed an Employment Intake Questionnaire with DCOHR.  Her charge was perfected and cross-filed with the Equal Employment Opportunity Commission ("EEOC") on June 26, 2013.  Ms. Brokenborough has exhausted her administrative remedies.  She requested a notice of right to sue from the EEOC on February 28, 2014 and received such by letter dated March 27, 2014.

45.     As a result of Defendants' actions, Ms. Brokenborough has been denied promotion for four years, causing her financial loss and emotional distress.  Ms. Brokenborough has suffered from insomnia and sought psychiatric counseling for the stress caused by Defendants.  In addition, Defendants' actions have resulted in significant emotional distress, humiliation, and anxiety for Ms. Brokenborough as she works every day in fear not only for herself and her job, but also for that of her son.

Michelle Murray

46.     Michelle Murray was employed by the DOC as a corrections officer from June 30, 2008 through April 9, 2014.  Ms. Murray had been assigned to the Intake Unit, the Command

Center, South East-1, North East-2, and other units.  All of Ms. Murray's performance ratings to date had been positive.

47.     Ms. Murray's fourth level supervisor was Defendant Pettiford.  For at least a period of three years, Defendant Pettiford was the Shift Commander of the 2nd Shift, on which Ms. Murray worked.

48.     Ms. Murray is a single parent with a young son.  From June 2008 through September 2011, Ms. Murray had requested and been granted permission from her supervisors, including the Warden, Deputy Warden, and several Commanders, to be excluded from the daily morning roll call in order to take her son to school.  For example, a March 13, 2010 memo requesting this accommodation was approved by a number of individuals.  Ms. Murray submitted this memorandum request each year she was employed and it had been approved every time.

49.     In October 2011, Ms. Murray again submitted her written request to Defendant Pettiford to renew her arrangement for another year.

50.     In response to her written request, Defendant Pettiford wrote down his telephone number along with the request, "Send me a picture of the twins."  Ms. Murray, who does not have twin children, was confused by the request and chose to ignore it.

51.     Several weeks later in October 2011, Defendant Pettiford summoned Ms. Murray to his office and asked her why she had not sent him the requested pictures.  Ms. Murray explained that she does not have twins.  Defendant Pettiford responded, "Yes you do," while looking pointedly at her breasts.

52.     Defendant Pettiford then requested that Ms. Murray undo her shirt and show him her breasts.  Ms. Murray refused this request and left his office.

53.     Ms. Murray did not file a complaint with the DOC's Office of Internal Affairs or report the incident to any of her superiors because she feared retaliation for making such a report and thought it would be futile.  Ms. Murray was aware of other female corrections officers who made complaints about sexual harassment and were terminated.

54.     Following the incident, Ms. Murray took measures to avoid Defendant Pettiford, such as avoiding the cafeteria, to prevent encounters with him.

55.     Shortly after rejecting Defendant Pettiford's sexual advances, Ms. Murray began to suffer retaliation from him and others.

56.     For example, Ms. Murray noticed her post was changed with increased regularity, forcing her to relocate three to four times per week.  Prior to rejecting Defendant Pettiford's advances, Ms. Murray had rarely been relocated.

57.     Ms. Murray also received fewer overtime opportunities.  Prior to rejecting Defendant Pettiford's advances, she had habitually requested and received two to four days of overtime per pay period.  After rejecting his advances, however, she would get, at most, one day of overtime, if at all.  On occasion, she was told that there was no overtime available even though she knew of employees who requested overtime after her and received overtime hours.

58.     In November 2011, Ms. Murray was informed that her request regarding roll call had been denied by Defendant Pettiford and other supervisors, despite the fact that it had been approved without question in prior years.  This request was denied by at least two of the same individuals — Simon Waynewright, the then-Warden, and Orlando Harper, then-Deputy Warden for Operations — who had previously approved the same request on prior occasions.

59.     In the following months, Ms. Murray faced harassment from co-workers who erroneously thought she submitted a sexual harassment complaint.  For example, Corporal

Montreal Ellerby, a male DOC employee, bumped into Ms. Murray in the hallway and commented, "Don't file a sexual harassment complaint on me."

60.     In addition, Ms. Murray was forced to wait approximately twenty minutes each morning for her daily assignment, while her colleagues typically received their assigned posts within minutes of arriving at work.

61.     In or about October 2012, Ms. Murray discussed the sexual harassment by Defendant Pettiford with at least two supervisors, including Sergeant Sheila Marr, one of her union representatives, and Captain Haynes.

62.     After the conversations with Sgt. Marr and Capt. Haynes, on October 9, 2012, Ms. Murray obtained a Cease and Desist Order, dated October 5, 2012, requiring that she and Defendant Pettiford have no unnecessary contact with each other.

63.     Yet despite the Cease and Desist Order, the retaliation against Ms. Murray continued.  Ms. Murray's son's school called the DOC trying to reach her to alert her to a medical emergency, but the DOC Command Center officers falsely informed the school that they were unable to forward the call to Ms. Murray.  The command center's actions delayed Ms. Murray from tending to her son, who was ten years old at the time.  Ms. Murray believes that Defendant Pettiford, whose supervisory authority covers the Command Center, encouraged the officers to not forward her calls.  Although Ms. Murray reported the incident to Lieutenant Brown, who reported to Captain Aden Bushee, the DOC Command Center officers were not disciplined.

64.     On November 13, 2012, Ms. Murray was suddenly placed on administrative leave with pay when another corrections officer accused her of failing to report that she had been

previously acquainted with a former inmate — an inmate who had been discharged from the

D.C. Jail two years prior.

65.     In December 2012, Ms. Murray submitted a complaint to the DCOHR regarding

the sexual harassment and retaliation she suffered, which was cross-filed with the EEOC.

66.     Only after submitting the complaint with DCOHR on February 14, 2013 was Ms.

Murray contacted by PREEMPT.  Jennifer Johnson, a PREEMPT Consultant, spoke to Ms.

Murray on the phone, and told her she would get back in touch with her.  Ms. Murray had not

been contacted by PREEMPT or any other DOC investigator prior to or since this date.

67.     On January 7, 2013, the DOC's internal investigation into Ms. Murray's alleged

violation of DOC policies concluded and Ms. Murray was recommended for termination.  Ms.

Murray believes that this unusually harsh disciplinary action proposed by Defendants was

retaliation for her rejection of Defendant Pettiford's sexual advances and for filing a complaint.

She believes that her continued suspension was the result of her protected EEO activity.

68.     Ms. Murray's FOP union representative, Sergeant John Rosser, contested the

proposed termination.  On June 7, 2013, Quinne Harris-Lindsey, a hearing officer with the D.C.

Attorney General's office, concluded that removing Ms. Murray from her position was

inappropriate.  The hearing officer found that Ms. Murray should be "allowed to continue her

employment without further adverse consequences."

69.     Following this June 2013 determination, Ms. Murray inquired with the DOC

when her administrative leave would end and when she would be reinstated.  She was not

provided any information regarding a timeline for her return.  In the meantime, Ms. Murray

checked in with the DOC daily as a condition of her administrative leave.

70.     Although Ms. Murray was paid during her administrative leave, she was not eligible to work overtime hours, and therefore lost the substantial overtime pay she previously received.  Prior to her administrative leave, Ms. Murray worked several days of overtime each pay period at a rate of $29 per hour.

71.     Due to her administrative leave, Ms. Murray was also not permitted to take the Sergeant's promotion exams for which she was eligible in the fall of 2012 and 2013.

72.     On March 27, 2014, Ms. Harris-Lindsey issued a new memorandum, this time recommending that Ms. Murray be removed from her position at the DOC.

73.     According to the memorandum, Director Faust remanded the action to Ms. Harris-Lindsey for a "reevaluation of the facts" by memo dated August 27, 2013, and again on January 30, 2014.

74.     Upon information and belief, neither Ms. Murray nor her union representative, Sgt. Rosser, received these memos or any notice that her case was under further review. Accordingly, Ms. Murray did not have an opportunity to respond.

75.     On April 7, 2014, Director Faust signed a letter informing Ms. Murray of her termination from the DOC.

76.     Ms. Murray was terminated from the DOC, effective April 9, 2014.

77.     As a result of Defendants' actions, Ms. Murray has suffered significant emotional distress, humiliation and anxiety, for which she sought counseling.  She has lost approximately thirty pounds since Defendant Pettiford sexually harassed her.

78.     Ms. Murray filed a charge with the DCOHR on December 13, 2012, which was cross-filed with the EEOC.  She requested a notice of right to sue from the EEOC on September 9, 2013, and received it by letter dated December 3, 2013.

Charnita Thomas

79.      Plaintiff Charnita Thomas began working at the DOC as a corrections officer on November 13, 2006.

80.      On or about February 2007, Defendant Pettiford called Ms. Thomas twice on the phone at her post in South-2 and ordered her to come to his office as soon as possible.  When Ms. Thomas arrived, Defendant Pettiford asked her to close the door.

81.      Defendant Pettiford then told Ms. Thomas he had been watching her on the jail cameras and that he was sexually attracted to her and wanted to have sex with her.  He asked Ms. Thomas, "When are you going to stop faking and sh*t?," which Ms. Thomas interpreted as asking her to give in to his sexual advances.  Defendant Pettiford also asked, "When are you gonna let me climb between the sheets with you and get it in?"  Defendant Pettiford was standing so close to Ms. Thomas that he was breathing in her face, and his stomach was touching Ms. Thomas's belt buckle.  Ms. Thomas turned down Defendant Pettiford and left his office.

82.      Thereafter, Defendant Pettiford stopped Ms. Thomas in the hallway or at roll call, called her to his office, and propositioned her on approximately a weekly basis.  At roll call, Defendant Pettiford would regularly announce Ms. Thomas's assigned post last so that he could make suggestive comments toward her.  For example, he made comments such as, "You know I want you," "What do you want to do?" and, suggestively, "Do you want to make this hard?"

83.      During one incident at roll call, Defendant Pettiford saw Ms. Thomas, gestured for her to wait for him to finish speaking with someone, and then leaned over and whispered in her ear, "So what's up?  You know what I'm talking about."  Defendant Pettiford's behavior made Ms. Thomas feel extremely uncomfortable and afraid for her safety.

84.     Despite Ms. Thomas's repeated refusals, Defendant Pettiford's unwelcome sexual advances continued on a regular basis.

85.     Ms. Thomas did not report Defendant Pettiford's harassment at first because she heard that upper management protects higher ranked officers at the expense of sexual harassment claimants.  Ms. Thomas was also afraid because she believed Defendant Pettiford was assigning her to "rough" posts (*i.e.*, known for frequent inmate fights or riots) for not giving in to his advances, and she did not want to lose her job.

86.     Ms. Thomas believed that the harassment might stop if she distanced herself from Defendant Pettiford, so she requested and received a transfer to the Juvenile Annex in or around June 2010.

87.     Although Ms. Thomas's new post was one building away, Defendant Pettiford continued to come to her post on a regular basis to proposition her or make sexually charged comments.  Ms. Thomas would try to leave (*e.g.*, perform an escort for medical or legal visits) if she knew Defendant Pettiford was coming so as to avoid him.  She would also hand the phone to someone else if Defendant Pettiford called.

88.     Despite Ms. Thomas's efforts, she could not avoid Defendant Pettiford entirely. For example, in or around June 2012, he came around to her post at the Juvenile Annex, leaned over close to her, and said, "You need to move that sweater from around your waist and drop it like it's hot."

89.     Ms. Thomas spoke with Lieutenant John Armstrong, one of her direct supervisors, regarding the harassment she had suffered, but he responded that he did not want to get involved.

90.     Due to the stressful nature of her work environment, Ms. Thomas felt upset, anxious, and unsafe at the jail.  She sought counseling and started seeing a physician to address

her mental health concerns.  On recommendation of her physician, Ms. Thomas took approximately six weeks of medical leave in July and August 2012.

91.     During this period, on August 22, 2012, Ms. Thomas filed a charge of discrimination with the DCOHR.

92.     In early September 2012, after Ms. Thomas returned to work, Ms. Thomas informed Wanda Patten and Karen Devalaire at the Office of Internal Affairs that Defendant Pettiford had sexually harassed her.  Ms. Patten nodded and mouthed to Ms. Thomas, so as not to allow her comment to be captured on a device recording the interview, "I believe you."

93.     Defendant Pettiford's campaign of harassment continued until September 26, 2012, when Ms. Thomas received a Cease and Desist Order against him.

94.     Ms. Thomas's complaint to the Office of Internal Affairs was referred to PREEMPT.

95.     Jennifer Johnson of PREEMPT interviewed Ms. Thomas regarding her sexual harassment complaint in September 2012.  Ms. Johnson informed Ms. Thomas that she would need to come back for a second interview.  However, Ms. Johnson never contacted Ms. Thomas regarding a second interview.

96.     In late October 2012, Ms. Thomas asked PREEMPT regarding the status of the sexual harassment investigation.  She was informed that her complaint had been reassigned to a new EEO Consultant, Jacqueline Johnson, and that "all complaint investigations are on hold pending FY 2013 budgetary processes."  Ms. Jacqueline Johnson also told Ms. Thomas, "during this period our communications have to be limited."

97.     Ms. Thomas emailed Defendant Faust and Mitchell Franks, on October 24, 2012, to report the lack of investigation by PREEMPT into her sexual harassment claim and the DOC's failure to maintain the confidentiality of sexual harassment complaints.

98.     Mr. Franks told Ms. Thomas that Preempt was "now conducting an investigation," yet when Ms. Thomas again asked PREEMPT regarding the status of the sexual harassment investigation shortly afterward, Ms. Jacqueline Johnson reiterated that the investigation "can not [sic] proceed."

99.     It was not until November 14, 2012 that PREEMPT finally informed Ms. Thomas that the company would be moving forward with investigations.

100.    Despite the Cease and Desist Order, Ms. Thomas believes that she was assigned to "rough" posts in retaliation for rejecting Defendant Pettiford's sexual advances and reporting the harassment.  For example, in or around November 2012, there was an inmate riot in Northeast-2.  After the riot, Ms. Thomas was one of only two women assigned to that block although she was informed that only male officers or members of the Emergency Response Team would be assigned to Northeast-2 after the riot.

101.    As a result of her ordeal, Ms. Thomas has suffered humiliation, severe anxiety, and emotional distress.  She was forced to seek counseling and medical attention and to take significant time off from work, for which she lost wages.

102.    Ms. Thomas has exhausted her administrative remedies and received her EEOC notice of right to sue on August 9, 2013.

Zenaida Massey

103.     Plaintiff Zenaida Massey was a corrections officer with the DOC from February 2008 to December 2012.

104.     Defendant Pettiford began asking Ms. Massey to come see him in his office with regularity in mid-2009.  Ms. Massey tried to make excuses to avoid going to his office or would come late hoping to miss him.  Defendant Pettiford, however, would call her post or send co-workers to relieve Ms. Massey so that she could come to his office.

105.     When Ms. Massey came to his office, Defendant Pettiford regularly touched himself through his pants while he spoke with her.

106.     Starting in mid-2010, Defendant Pettiford began making sexual comments to Ms. Massey approximately once per month.  He would ask to see "the twins" (*i.e.*, breasts) and hinted that Ms. Massey could be promoted if she acquiesced to his advances.  Ms. Massey refused and tried to avoid Defendant Pettiford.

107.     In late 2010, early 2011, Defendant Pettiford pointedly mentioned to Ms. Massey that a post change was coming up.  Ms. Massey was moved to the midnight shift, a change she understood as retaliation for her not acquiescing to Defendant Pettiford's unwelcome advances.  Being placed on the midnight shift posed great difficulty to Ms. Massey because she is a single mother and her schedule interfered with her ability to care for her daughter.  She raised her childcare concerns with Defendant Pettiford.  He indicated that he could help her but that he would not do so.  Despite the difficulty, Ms. Massey completed her six month rotation on midnight shift.

108.     In mid-2012, Ms. Massey was again placed on the midnight shift. Upon information and belief, working two midnight shifts in such a short time was unusual for DOC employees, especially for one with Ms. Massey's seniority.

109.     In April 2012, while assigned to the midnight shift, Ms. Massey was alerted that her daughter, who was seven years old at the time, was performing poorly at school and would be held back. For her daughter's sake, Ms. Massey decided to give Defendant Pettiford what he wanted sexually.

110.     Ms. Massey and Defendant Pettiford then entered into a *quid pro quo* sexual relationship in May or June of 2012. Ms. Massey acquiesced to Defendant Pettiford's requests to show her breasts and to touch them. Defendant Pettiford would rub himself on Ms. Massey and ejaculate on the floor next to her.

111.     Soon after the transactional relationship began, Ms. Massey was moved back to the day shift between post changes. Ms. Massey received other benefits as well, such as extended lunch breaks, favorable posts, and weekends off.

112.     When rumors began that several women were pursuing sexual harassment charges and claims against Defendant Pettiford, he began asking Ms. Massey for information about the claimants, but she had none to give. To prevent Defendant Pettiford from turning against her, Ms. Massey assured him that she would never tell anyone about what he had done to her.

113.     In late 2012, Defendant Pettiford ended the *quid pro quo* sexual relationship. Ms. Massey believes that he ended the relationship because he was getting nervous about women pursuing sexual harassment claims against him.

114.     In late 2012, upon information and belief, Defendant Pettiford helped orchestrate an Internal Affairs investigation against Ms. Massey in retaliation for her failure to provide him

information about potential sexual harassment complaints against him.  Ms. Massey was under investigation for allegedly violating internet policies and for over familiarization with an inmate, infractions for which other employees were not regularly terminated.

115.    Ms. Massey maintains she did not violate DOC policies.  Nevertheless, Defendant Pettiford persuaded Ms. Massey to resign, ostensibly to save herself from having the investigation on her record, and offered to help her find other employment.  Ms. Massey submitted her resignation in December 2012.  Defendant Pettiford never helped her seek other employment.

116.    Despite her credentials and best efforts to obtain new employment, Ms. Massey remains unemployed.  Upon information and belief, the retaliatory investigation orchestrated by Defendant Pettiford and initiated by the DOC has made it difficult for Ms. Massey to find a job.

117.    As a result of her ordeal, Ms. Massey has suffered humiliation, severe anxiety, and emotional distress.

Joyce Webb-Bridges

118.    Plaintiff Joyce Webb-Bridges has worked at the DOC as a corrections officer since November 2, 1981 with a five-year break in her service at DOC from October 2000 through January 2006.

119.    For over two decades, Ms. Webb-Bridges has experienced and continues to experience sexual harassment, retaliation, and a hostile work environment at the D.C. Jail.

120.    Ms. Webb-Bridges was a successful claimant in a prior sexual harassment lawsuit against the DOC.  *See Webb v. Hyman*, 861 F. Supp. 1094 (D.D.C. 1994).  When she returned to work following conclusion of her case and a medical leave of absence, Ms. Webb-Bridges faced retaliation and a hostile work environment.  According to Ms. Webb-Bridges, individuals at the

DOC, including the Deputy Director at the time, specifically targeted women who participated in the *Neal* class action suit and other similar litigation for retaliation.

121.    Due to the stress she experienced as a result of the retaliation she suffered after her participation in the lawsuit, Ms. Webb-Bridges resigned in October 2000, intending to return after six months.  However, when she attempted to return to the DOC, Ms. Webb-Bridges was denied her position. Other correctional officers who had taken a leave of absence during this time were reinstated, but Ms. Webb-Bridges only regained her job after five years of persistently reapplying for her job and contacting her local representatives.

122.    When Ms. Webb-Bridges was finally permitted to return to the DOC in January 2006, she was treated as a new employee, not as a corrections officer with twenty years of service for the DOC.  Ms. Webb-Bridges suffered a drop in pay grade: she was ranked as a Grade 8/Step 8 when she left the D.C. Jail in 2000, but was inexplicably rehired at a Grade 8/Step 5.  Furthermore, Ms. Webb-Bridges received undesirable job and shift assignments.  She continues to suffer the effects of this demotion through reduced salary and job-related stress and anxiety.  Upon information and belief, these adverse actions are part of a continuing pattern of retaliation for her having sued the DOC.

123.    In addition to the continuing retaliation she has suffered, Ms. Webb-Bridges has also recently been the subject of severe and persistent sexual harassment while on duty at the DOC.

124.    On May 27, 2013, Memorial Day, Ms. Webb-Bridges was assigned to Floor Control 2.  During her shift, a male superior officer in her chain of command, Lieutenant Marion Kirkland, entered the unit and sat down near Ms. Webb-Bridges.  During this encounter, the Lieutenant pulled out his penis and moved closer to Ms. Webb-Bridges, asking her repeatedly to

touch it.  Shocked by his actions, Ms. Webb-Bridges instructed the Lieutenant to "put it away" and stated, "I can't believe you are doing this."

125.    After the incident, the Lieutenant continued to approach Ms. Webb-Bridges at the DOC, in addition to calling and texting her.  During these contacts, the Lieutenant would continue to make sexual advances toward Ms. Webb-Bridges, making comments such as "I want you."

126.    Ms. Webb-Bridges did not report this incident or the continued sexual advances to her superiors at DOC due to her fear of retaliation based on the years of retaliation she suffered — and continues to suffer — at the DOC for her prior report of sexual harassment and her protected EEO activity.

127.    In fact, even without reporting the most recent sexual harassment, Ms. Webb-Bridges believes that she continues to suffer retaliation as a result of the pervasive lack of respect for private matters at the DOC.  For example, during the recent shift change process, Ms. Webb-Bridges was assigned to Floor Control again, a post considered to be one of the least desirable.

128.    On March 11, 2014, Director Faust issued a letter indicating that Ms. Webb-Bridges would be separated from the DOC by retirement, effective May 31, 2014.

129.    As a result of Defendants' actions, Ms. Webb-Bridges has suffered significant emotional distress, humiliation, and financial loss, including costs for psychiatric treatment.

130.    On November 7, 2013, Ms. Webb-Bridges filed a charge with the EEOC alleging sexual harassment and retaliation.  She has requested that her charge not be cross-filed with DCOHR; she instead files this suit alleging violations of the D.C. Human Rights Act.

131.    Ms. Webb-Bridges has exhausted her administrative remedies.  She received a Dismissal and Notice of Rights from the EEOC dated January 31, 2014 informing her that the EEOC had closed its file on her charge due to this private litigation.

Beverly Richardson

132.    Beverly Richardson has been a corrections officer at the DOC since September 2009.

133.    On July 13, 2013, Corporal Butler grabbed Ms. Richardson's upper thigh, placing his hand near her vagina.  Ms. Richardson believed that his actions were intentional and unavoidably sexual and told him to take his hands off of her.

134.    Ms. Richardson reported the incident that day to Lieutenant Cynthia Williams and Captain Ellen McDonald Haynes.  Ms. Richardson completed an internal EEO questionnaire and was issued a Cease and Desist Order.  Some time thereafter, she was contacted by PREEMPT, but has not heard anything since.

135.    The Cease and Desist Order has not been respected.  In early August 2013, Ms. Richardson was twice forced to interact with the Corporal.  On August 3, Lt. Williams — the same supervisor who issued the Cease and Desist Order — required her to attend roll call where the Corporal was present.  The next day, she was again forced to attend roll call and again encountered the Corporal at the staff entrance to the D.C. Jail.

136.    Ms. Richardson further believes that the confidentiality of her complaint was not respected, and that much of the DOC personnel is aware of her grievance.  Because of the hostile manner in which sexual harassment complaints are treated by DOC personnel, Ms. Richardson has been teased by other correctional officers; one male officer told her "I'm going to hit the other thigh."  She further believes that other officers gossip behind her back.

137.    Being forced to be in close proximity with the man who physically harassed her has caused Ms. Richardson significant humiliation, emotional distress, and anxiety, and has further caused her to isolate herself from other DOC staff.  She has been forced to seek counseling as a result of her stress.  Due to stress, Ms. Richardson resigned in December 2013.

138.    Ms. Richardson completed an intake interview at DCOHR on October 1, 2013. She withdrew her DCOHR charge on November 6, 2013, so that she may pursue her rights under the D.C. Human Rights Act.   Upon information and belief, her charge was perfected and cross-filed with the EEOC on October 21, 2013.  More than 180 days have elapsed and the agency has not issued a final decision.  Ms. Richardson requested a notice of right to sue from the EEOC on April 21, 2014, but has not received it.

### C.    Pervasiveness of Sexual Harassment and Retaliation at the DOC

139.    Far from being isolated incidents, the accounts of multiple witnesses demonstrate that Plaintiffs' experiences are part of a longstanding and continuing pattern and practice of implicit and explicit *quid pro quo* sexual harassment against female DOC employees, a sexually hostile work environment, and retaliation against employees (both male and female) who resist or oppose the harassment.

Female Witness #1:  Ja'net Sheen

140.    Defendant Pettiford harassed former corrections officer Ja'net Sheen from late 2007 to approximately April 2009, when she was assigned to the DOC Command Center, where Defendant Pettiford was stationed.  Defendant Pettiford would proposition Ms. Sheen approximately eight times per shift, making comments such as "I don't care if you think you're better than everyone else, but you're going to give me some," or "It's just a matter of time. You're going to give me some."

141.    Almost immediately after the harassment began, Ms. Sheen requested to transfer to a different post.  Defendant Pettiford responded that he did not care what she felt or said, because she was going to remain at her post.  He remarked, "Eventually, you're going to break down."

142.    When Defendant Pettiford's campaign of sexual harassment intensified in 2008, Ms. Sheen reported the harassment to then-Deputy Warden Orlando Harper.  Mr. Harper said he would look into the problem, but he never followed up.  Ms. Sheen was never contacted by an investigator.

143.    In addition to ignoring her complaint, Defendants began retaliating against Ms. Sheen in several ways.  Shortly after she reported the harassment, Ms. Sheen's fiancée, also a DOC employee, received an unfavorable post change.

144.    After Ms. Sheen resigned and reapplied to the DOC, her application was rejected although she completed her physical exam and passed all the requisite exams.  Ms. Sheen was informed that she had been disqualified due to the results of her background check, even though she does not have a criminal record.  When Ms. Sheen contacted Mr. Harper to inquire, Mr. Harper told her, "If you had taken care of the right people and done the right things, maybe you would have been back."

145.    Ja'net Sheen also suffered sexual harassment from another supervisor, a Lieutenant, from approximately December 2006 until sometime in 2007.  The Lieutenant offered favorable post positions and shifts if she would engage in sexual relations with him.  As often as once per week, when he passed her in the hallway, or ran into her at the command center or outside the jail, the Lieutenant would make statements such as, "If you do the right thing, all you

have to do is say the right word, and you could get whatever you wanted," or "I could do a lot of things for you." He would also offer to let her pick her post and shift.

146.   Ms. Sheen rejected the Lieutenant's sexual advances but never reported the harassment for fear of losing her job.

Female Witness #2: Deborah Moton

147.   Deborah Moton, a female Corporal who has worked for the DOC since 1990 (with an eight-year break in service), was sexually harassed by her supervisor, a Lieutenant, in June 2010. When Ms. Moton was faxing paperwork in an office, the Lieutenant came into the room and started rubbing himself against her from the back.

148.   Ms. Moton pushed him away and told him to stop. The Lieutenant responded that he knew she liked it. She again told him to stop and then pushed him to the side so that she could leave the office.

149.   Ms. Moton did not complain of the sexual harassment to which she had been subjected because she believed that higher ranking officials look out for each other and that complaining would be futile.

150.   According to Ms. Moton, the DOC training on sexual harassment is woefully deficient. Indeed, a recent DOC training on sexual harassment in January 2013 consisted only of giving employees a DVD, securing employee signatures to acknowledge receipt, and telling them to watch it on their own time, even though not everyone has personal access to computers or DVD players.

Female Witness #3: Kelli Dunn

151.   Kelli Dunn, a female corrections officer, was consistently harassed by Defendant Pettiford from September 2009 until March 2010.

152.    For a time during this seven-month period, Defendant Pettiford made sexual comments to her approximately two or three times per week, including requests for kisses, invitations to "sit on big daddy's lap," and requests to come to his office to "go for a ride" (*i.e.*, engage in sexual intercourse).  Ms. Dunn rejected all of these sexual advances.

153.    Ms. Dunn had previously requested to arrive at roll call fifteen minutes late due to childcare issues.  The request had previously been routinely approved, including by Defendant Pettiford.  Nevertheless, in 2010, when Ms. Dunn showed a copy of the approval memo to Defendant Pettiford, he claimed that he had never approved the request and instructed her to come to roll call on time.  Upon information and belief, Defendant Pettiford retroactively denied Ms. Dunn's request for scheduling accommodations in retaliation for rebuffing his sexual advances.

154.    In addition, Ms. Dunn did not receive a promotion for which she was eligible in November 2009 until late 2012.  Ms. Dunn believes that this adverse employment action was in retaliation for her rejection of Defendant Pettiford's sexual requests.

Female Witness #4: Shaneka Nipper

155.    Shaneka Nipper, a former corrections officer, has been harassed by several male officers at the DOC.

156.    In 2009, Ms. Nipper's supervisor, a Captain, called her to his office.   He asked Ms. Nipper to shut the door and sit so he could talk to her.  He asked her if she had ever slept with anyone in the department and what she did after hours.  He asked to meet her after work, including suggestive comments such as "I've got my [over]night bag in my trunk.  I'm ready whenever you are."  Ms. Nipper rebuffed the advances, stated she was married, and got up to

leave the office.  As she was preparing to leave, the Captain looked at Ms. Nipper's breasts and stated, "You know what I can do with your breasts?"

157.    After the incident, Ms. Nipper wrote a statement and gave it to another Captain who said he would notify the Office of Internal Affairs.  However, when Ms. Nipper spoke with the FOP, she was told that the union had never been notified of her complaint, even though it usually receives notice of complaints.  FOP also notified Ms. Nipper that there was no record of her complaint in her DOC personnel file.

158.    From that point until she was terminated, Ms. Nipper's supervisor would make sexual comments to her approximately once per month, asking if she had thought about what he had said in his office.  When she was performing shakedown duties and had to bend over, he regularly made sexual comments, including "Don't do that.  You're arousing me."  During roll call, he would also call her by denigrating nicknames such as "Nipples" or "Nip it" as often as once or twice per week.

159.    Another male officer, a Lieutenant, made sexual comments to Ms. Nipper approximately once every two months from 2009 onward.  He would make comments about her breasts and behind, saying things like "Your breasts look good.  I wish I could suck your breasts."  He also asked her if they could get together after work for sex.

160.    Defendant Pettiford has also harassed Ms. Nipper.  Several times in early 2010, while in an elevator together, Defendant Pettiford pointed at his penis and told Ms. Nipper, "You don't know what to do with this."  After that, Defendant Pettiford stopped making sexual comments to Ms. Nipper, but he did make sexual gestures to her approximately once per month.  Defendant Pettiford would look pointedly at his penis and then look up at Ms. Nipper and smile suggestively.

161.    On or about September 19, 2010, Ms. Nipper was notified that she was a term employee and that her contract would not be renewed.  At the time, however, her term had expired the previous year, at which point she had become a permanent employee.  Ms. Nipper believes that she was terminated in retaliation for refusing to acquiesce to sexual advances and complaining about sexual harassment at the DOC.

162.    Ms. Nipper has reapplied to the DOC and been rejected approximately three times, most recently in the fall of 2012.  Although Ms. Nipper believes she meets the qualifications for the position she applied for, she was told that she was rejected because she did not qualify.

Female Witness #5: Takia Wilson

163.    Takia Wilson, a female case manager, observes male employees making inappropriate sexual comments such as "I've got a hard d*ck" toward female employees nearly every day.

164.    She has also been sexually harassed by a female Sergeant.  In June 2012, the Sergeant smacked Ms. Wilson on the buttocks as the latter was leaving the elevator, in front of several witnesses.  Ms. Wilson responded by pushing the Sergeant away.  The Sergeant then smacked Ms. Wilson again, laughing.  The Sergeant had also previously pinched Ms. Wilson on the breast.

165.    Ms. Wilson reported the unwelcome touching to her supervisor, who notified then-Deputy Warden of Operations, Orlando Harper.  Ms. Wilson and her supervisor met with Mr. Harper, a meeting that the Sergeant was supposed to, but did not, attend.  Ms. Wilson signed a Cease and Desist Order when prompted by Mr. Harper.  However, to Ms. Wilson's knowledge,

the Sergeant did not sign.  Ms. Wilson was not informed of her rights under the D.C. Human

Rights Act or any other avenues for pursuing a claim.

166.    Despite the Cease and Desist Order, Ms. Wilson continued to see the Sergeant

since they were in the same shift area.  Ms. Wilson perceived that the Sergeant began giving her

attitude and responding to emails with hostility.

167.    In February 2013, Ms. Wilson was informed that a Lieutenant who was a close

friend of the Sergeant had written her up, and that she would be placed on administrative leave

pending an investigation.  The Lieutenant was not in Ms. Wilson's chain of command.  At the

time, Ms. Wilson was not told the basis for her being placed on administrative leave.

168.     Ms. Wilson was on administrative leave for four months before being allowed to

return to work.  Ms. Wilson believes she was placed on administrative leave for not logging a

legal call placed by an inmate, although she is not aware of any other officer who has been

placed on administrative leave for a similar length of time for failing to log an inmate call.  Ms.

Wilson believes that she was written up and subsequently placed on administrative leave in

retaliation for complaining about sexual harassment.

169.    Ms. Wilson's Cease and Desist Order continues to be violated.

Female Witness #6: Deborah Smith

170.    Deborah Smith, a clerical assistant at the DOC, was sexually harassed from 2011

to 2012 by her direct male supervisor.

171.    The supervisor made sexual comments to Ms. Smith about her appearance on a

weekly basis, including comments about her appearance and comments about being able to see

her undergarments through her pants.  On one occasion he told her, "You've gotten fat, but I can

still work with that."  As he made this comment, he stuck his hands down the front of his pants

and touched himself.  Ms. Smith told him that she did not appreciate his comments because she was married.

172.    Ms. Smith reported the harassment to then-Warden Simon Waynewright and Deputy Director Carolyn Cross in writing.  Neither responded.  A Cease and Desist order was never issued.

173.    She was also told by Mr. Waynewright that she would not be transferred out from under the perpetrator's supervision.  Ms. Smith believes she was subjected to retaliatory discipline for reporting sexual harassment her supervisor.  On two occasions, he suspended her for insubordination, one of which resulted in her losing eighty-four hours of wages over the course of one month.

174.    According to Ms. Smith, sexual harassment training at the DOC lasts approximately fifteen minutes.

Female Witness #7:  Barbara Copeland

175.    In January of 2012, Ms. Copeland approached her male supervisor in his office to ask about her performance ratings because she was considering applying for federal job openings.  Ms. Copeland's supervisor stated, "If you kiss me, you can get a job."  Ms. Copeland rejected his advance.  Prior to that instance, he would make comments that made Ms. Copeland uncomfortable (such as "You still got it after all these years") every time she saw him, approximately once every six months.

176.    When Ms. Copeland returned to work the following Monday, she learned that the supervisor had written her up for not completing an assignment, despite the fact that she had in fact completed it.  Ms. Copeland has tried to dispute the write up through her union but still has a "counseling" session on her record.

177.     That same day, Ms. Copeland reported the supervisor's harassing behavior via email to then-Warden Gregory Futch.  A Cease and Desist Order was issued and Ms. Copeland was interviewed by Wanda Patten of the Office of Internal Affairs, but she was never informed about potentially pursuing an administrative claim through DCOHR.

178.     After she reported him, the supervisor would make comments to Ms. Copeland indicating that he was a vengeful person and suggesting that he would retaliate against her.  The supervisor still has authority over Ms. Copeland and continues to retaliate against Ms. Copeland by requiring her to undergo more frequent urine tests than other employees.  Ms. Copeland fears that she will be terminated.

179.     According to Ms. Copeland, sexual harassment training at the DOC is inadequate. Training lasts approximately fifteen to twenty minutes, during which trainers have made denigrating comments about the plaintiffs in the *Neal* class action.  In addition, employees are handed a training DVD, but most do not look at it.

**D.     Further Corroboration By Male Employees Regarding the Hostile Work Environment at the DOC**

180.     Male employees have corroborated the accounts of female employees regarding the abusive and hostile working conditions at the DOC.

Male Witness #1: Tyrone Jenkins

181.     Tyrone Jenkins, a Sergeant and a FOP representative, stated that sexual harassment is "rampant" at the DOC.

182.     Mr. Jenkins has been a DOC employee since March 1985, before the *Neal* lawsuit.  He believes that conditions at the DOC are as bad as before the *Neal* litigation.

183.    Mr. Jenkins stated that he observes male supervisors kiss, touch, hug, and grab female officers every day.  He has witnessed some female employees jerk back or shove away the perpetrator, while others resign themselves to the physical contact to "get it over with."

184.    According to Mr. Jenkins, as recently as August 2013, one male supervisor would lean in close to approximately five female employees during roll call and ask them to show him their breasts in exchange for not writing them up for failing to wear a name tag on their uniform.

185.    Mr. Jenkins estimated that approximately 200 women were the victims of harassment at the DOC over the last five years.

186.    He also knows of several women who left their jobs at the DOC because the harassment was so intolerable.

187.    Mr. Jenkins knows of approximately five or six female employees who have approached him about being sexually harassed by Defendant Pettiford, but who were too scared to report the harassment.

188.    According to Mr. Jenkins, sexual harassment complaints "never make it through," and complainants are often not told of their rights.

189.    Mr. Jenkins also believes that women who submit complaints consistently face retaliation, often in the form of the denial of overtime opportunities or changes in shifts and posts.

190.    Mr. Jenkins believes that the DOC has retaliated against him because of his efforts to assist female employees who have filed harassment complaints.  For example, Mr. Jenkins approached the Warden and Defendant Pettiford on a Friday in or around March 2013 to request that a Cease and Desist Order obtained by a female employee be enforced by moving the alleged sexual harasser, not the victim, from a shift area.  Mr. Jenkins's supervisor was ordered

to move the harasser.  On the following Monday, Mr. Jenkins's shifts and posts began changing frequently — on a near daily basis.  Prior to March 2013, Mr. Jenkins had a fixed post.

191.    Mr. Jenkins also suffered retaliation in the form of denial of overtime.  Prior to March 2013, Mr. Jenkins regularly received between two to four days of overtime per pay period.  After March 2013, he received no overtime for a period of approximately six months.

192.    According to Mr. Jenkins, sexual harassment training at the DOC is a "joke" and is not taken seriously.  Sexual harassment training consists of handing out the DOC sexual harassment policy and asking employees to sign an acknowledgment of receipt thereof, followed by a presentation lasting approximately ten to fifteen minutes.

Male Witness #2: Andra Parker

193.    Andra Parker, a senior corrections officer, has worked at the DOC since 1990.

194.    Although Mr. Parker is not a FOP representative, he is a certified training instructor familiar with DOC administrative procedures.  Mr. Parker has provided information about sexual harassment policies as well as procedures for reporting and filing sexual harassment complaints to female DOC employees.

195.    Mr. Parker is aware of at least seven female DOC employees who have been sexually harassed within the last two to three years.  Mr. Parker reported these instances of sexual harassment to superior officers, including the Warden, Deputy Director, and Director.  According to Mr. Parker, these women have told him that they have been subjected to inappropriate touching, sexual comments, unwelcome requests for dates in exchange for favorable post assignments, and exposure to private parts.  These women also stated that they feared reprisal from reporting sexual harassment.

<u>Male Witness #3:  Deon Jones</u>

196.    Deon Jones, a Sergeant, has worked at the DOC since 1992.

197.    Mr. Jones witnesses male employees making sexually charged comments such as "I want to get that p\*ssy," "Let me get up on that," or "Let me mash that off" (*i.e.*, have sex with you) to female employees on a near daily basis.

<u>Male Witness #4:  Keith Allison</u>

198.    Sergeant Keith Allison, a union representative, has been employed by the DOC since May 8, 1989.  Mr. Allison stated that the DOC has moved away from many of the improvements made as a result of the *Neal* suit.

199.    According to Mr. Allison, sexual harassment training at the DOC is inadequate. He believes employees lack training regarding what constitutes harassment.  Mr. Allison stated that at a training in January 2013, there was hardly any mention of sexual harassment, and that the class was taught by an officer formerly accused of sexual harassment.

200.    According to Mr. Allison, approximately half of the women who approach him because they have suffered sexual harassment do not formally report it because they fear retaliation and termination.  For the women who do formally report sexual harassment, Mr. Allison stated that their complaints often fall on deaf ears or the women suffer retaliation.  They may be placed in "rough" units (*e.g.*, units where inmates expose their genitals to officers), and have their shifts and posts changed rather than moving the perpetrators of harassment.

201.    According to Mr. Allison, the DOC does not follow the rules and regulations regarding sexual harassment complaints, which results in women feeling uncomfortable and fearful throughout the complaint process.  He stated that former EEO officer Mitchell Franks internally investigated many complaints of harassment and would nearly always find in favor of

the DOC, concluding that the complainants presented insufficient evidence.  Mr. Allison believes

the DOC should not be investigating complaints internally.  He said there is no place for victims

of harassment to go and very few people know about PREEMPT.

### E.   Conclusion

202.    As the experience of Plaintiffs and numerous witnesses demonstrates, Plaintiffs

and other employees at the DOC have been subjected to a pattern and practice of sexual

harassment, retaliation, and an abusive and hostile working environment:

Quid Pro Quo

203.    Plaintiffs' supervisors have demanded sexual favors from female employees, or

offered employment benefits such as promotions or favorable post assignments to female

employees in exchange for sexual favors.

204.    Female employees who acquiesce to the sexual demands of superiors receive

benefits such as favorable post assignments, favorable shifts, and promotions.

205.    In stark contrast, female employees who reject such sexual advances suffer

adverse employment actions such as denied promotions and requests for overtime, unwarranted

disciplinary actions, and less favorable posts and shifts despite having greater seniority.

Hostile Work Environment

206.    Plaintiffs' supervisors and co-workers engage in offensive conduct of a sexual

nature on a regular basis, including commenting on female employees' physical appearance,

making lewd remarks, engaging in unwanted physical contact, exposing their genitals to female

employees, and pressuring female employees to engage in sexual relations.

207.    Furthermore, the hostility with which sexual harassment complaints are treated

within the DOC, including routine breaches of confidentiality regarding the identity of

complainants and the nature of their complaints, contributes to a hostile work environment by exposing victims of harassment to teasing, gossip, and retaliatory acts.

208.     The harassers often include male supervisors, such as Defendant Pettiford, who have the power to make decisions regarding, *inter alia*, promotions.

209.     This continuous harassment has created a hostile working environment and altered the terms and conditions of employment for women at the DOC.

210.     Indeed, this unwanted and unwelcome sexual conduct and harassment is so severe or pervasive that some female employees, including Plaintiffs Murray, Richardson, and Thomas, have had to attend counseling or take leaves of absence from work due to stress and anxiety.

Retaliation

211.     Employees who formally or informally report sexual harassment or the hostile work environment, and those who support the complaints made by others, routinely suffer retaliation.  Retaliatory acts include constant criticism, denial of promotions, assignment to unfavorable or dangerous posts or shifts, denial of routine and generally accepted work requests, baseless or unusually harsh disciplinary actions, and termination.

212.     Because of this long-standing and pervasive pattern of retaliation against female employees who report harassment, other female employees who are victims of harassment frequently do not report it for fear of jeopardizing their careers due to the potential for unjustifiably being placed on leave or terminated.

Policy/Custom and Deliberate Indifference

213.     Sexualized comments, lewd remarks, and unwanted physical contact directed at female employees are open, notorious, commonplace, and on full display at the D.C. Jail. Employees, both male and female, observe the inappropriate behavior on a regular basis.  Even

42

worse, the procedures to address and prevent such incidents are not only rarely used, but also grossly inadequate.

214.    Upon information and belief, Director Faust was aware or should have been aware of sexual harassment and retaliation at the DOC and knowingly failed to act to stop the abuse.

215.    Defendants have acted with such deliberate indifference to repeated complaints of harassment and retaliation that they have effectively created a policy and custom that complaints of harassment will be ignored, insufficiently investigated, or even covered up.

216.    Defendants stifle some women's sexual harassment claims at the outset by failing to put them in touch with counselors, failing to inform them of their rights or by simply ignoring their complaints altogether.  In addition, upon information and belief, on at least one occasion, Mitchell Franks, the DOC's former EEO officer, failed to notify the DOC's external investigative body of complaints of harassment.

217.    Complaints that are not ignored or stifled at the outset are supposed to be sent to PREEMPT, a third-party entity, for investigation.  Upon information and belief, in theory, PREEMPT investigates complaints, proposes findings as to whether sexual harassment or retaliation has occurred, then forwards those findings with recommendations to the Office of Internal Affairs and the Director of the DOC.  The Director then either adopts or rejects the findings and recommendations.

218.    Yet even PREEMPT's investigations, if they are able to investigate at all, do not provide effective relief.  For example, PREEMPT has failed to timely contact complainants, failed to fully investigate complaints, and, in some instances, ceased all investigations for a time due to budgetary or contract disputes with the DOC.

219.     Despite the existence of sexual harassment policies and procedures (which are routinely ignored or violated), Defendants, upon information and belief, have actively worked to conceal complaints of harassment by pressuring women to drop their complaints and threatening them with additional retaliation.

220.     Upon information and belief, the Office of Internal Affairs frequently does not issue Cease and Desist orders and, even when they are issued, does not enforce them.

221.     In addition, upon information and belief, the DOC promoted Defendant Pettiford to Deputy Warden despite having full knowledge that he regularly harassed and discriminated against female employees.

222.     Given the long history of past transgressions by the DOC, and the open and notorious nature of the abusive and hostile conditions at the DOC, Defendants were on notice that stringent supervision and training for all DOC employees was required.  Their failure to meet that obligation directly and proximately caused the acts complained of in this litigation.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF § 1983 FIFTH AMENDMENT EQUAL PROTECTION
### (*Quid Pro Quo* Sexual Harassment)
### (Plaintiffs Murray, Brokenborough, and Massey v. All Defendants)

223.     Plaintiffs Murray, Brokenborough, and Massey reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

224.     Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

225.     At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

226.     Plaintiffs Murray, Brokenborough, and Massey, female employees of the DOC, are members of a protected class.

227.     Defendants, both individually and through their agents, made unwelcome and unwanted sexual advances and sexual comments to Plaintiffs Murray, Brokenborough, and Massey because of their sex.  Defendants conditioned Plaintiffs' receipt of job benefits on their acquiescence to those sexual advances.  When Plaintiffs Murray, Brokenborough, and Massey refused to acquiesce, they suffered tangible adverse employment actions, and when Ms. Massey acquiesced, she received favorable treatment.

228.     Defendants' conduct constitutes sex discrimination in violation of Plaintiffs' right to equal protection under the Fifth Amendment to the United States Constitution.

229.     Defendants had notice and knowledge of unlawful conduct by Defendants and, through their failure to remedy and prevent such violations of law, have established ongoing and pervasive sexual harassment as the custom and policy of the DOC.

230.     Defendants had notice and knowledge of unlawful conduct by Defendants and, through their failure to remedy and prevent such violations of law, have demonstrated deliberate indifference to the risk that such activity would result in constitutional violations.

231.     Defendants, implicitly or explicitly, with intent and knowledge of the foreseeable consequences, condoned, authorized, or ratified the conduct of their agents, promoted or permitted a working environment where such conduct was tolerated, condoned or encouraged, and systematically violated their own purported policies prohibiting sexual harassment in the workplace.  Such actions were taken by or with the knowledge of the Director of the Department.  Sex discrimination through sexual harassment is the custom, usage and unwritten policy of the

DOC and Defendants and their agents have been deliberately indifferent to the unlawful and unconstitutional activity that occurs daily at the DOC.

232.     Defendants, acting under color of state law, violated the federally protected rights of Plaintiffs in violation of 42 U.S.C. § 1983.

**COUNT II**
**VIOLATION OF § 1983 FIFTH AMENDMENT EQUAL PROTECTION**
**(Hostile Work Environment)**
**(All Plaintiffs v. Defendant District of Columbia)**
**(Plaintiffs Brokenborough, Massey, Murray and Thomas v. Defendant Pettiford)**

233.     Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

234.     Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

235.     At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

236.     Defendants, both individually and through their agents, made unwelcome and unwanted sexual advances and sexual comments to Plaintiffs because of their sex.  These sexual advances and comments subjected Plaintiffs to intimidation, ridicule and insult and were so severe or pervasive that they altered the conditions of Plaintiffs' working environment, constituting a hostile work environment.

237.     Defendants' conduct constitutes sex discrimination in violation of Plaintiffs' right to equal protection under the Fifth Amendment to the United States Constitution.

238.     Defendants had notice and knowledge of unlawful conduct by Defendants and, through their failure to remedy and prevent such violations of law, have established ongoing and pervasive sexual harassment as the custom and policy of the DOC.

239.     Defendants had notice and knowledge of unlawful conduct by Defendants and, through their failure to remedy and prevent such violations of law, have demonstrated deliberate indifference to the risk that such activity would result in constitutional violations.

240.     Defendants, implicitly or explicitly, with intent and knowledge of the foreseeable consequences, condoned, authorized, or ratified the conduct of their agents, promoted or permitted a working environment where such conduct was tolerated, condoned or encouraged, and systematically violated their own purported policies prohibiting sexual harassment in the workplace.  Such actions were taken by or with the actual or constructive knowledge of the Director of the Department.  Sex discrimination through sexual harassment is the custom, usage and unwritten policy of the DOC and Defendants and their agents have been deliberately indifferent to the unlawful and unconstitutional activity that occurs daily at the DOC.

241.     Defendants, acting under color of state law, violated the federally protected rights of Plaintiffs in violation of 42 U.S.C. § 1983.

## COUNT III
## VIOLATION OF TITLE VII
### (*Quid Pro Quo* Sexual Harassment)
### (Plaintiffs Brokenborough and Murray v. Defendant District of Columbia)

242.     Plaintiffs Brokenborough and Murray reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

243.     Plaintiffs Brokenborough and Murray, female employees of the DOC, are members of a protected class.

244.     Supervisors at DOC, in particular Defendant Joseph Pettiford, made unwelcome and unwanted sexual advances and sexual comments to Plaintiffs Brokenborough and Murray because of their sex.  Defendants conditioned Plaintiffs' receipt of job benefits on their acquiescence to those sexual advances.  When Plaintiffs refused to acquiesce, demonstrating that

47

such advances and comments were unwelcome, they suffered tangible adverse employment actions.

245.     The unwelcome sexual advances made by supervisors, Defendants and their agents toward Plaintiffs Brokenborough and Murray constitute sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

246.     Defendant Pettiford and Defendants' agents were acting within the scope of their employment when they sexually harassed Plaintiffs Brokenborough and Murray.

247.     Defendants' discriminatory practices have caused Plaintiffs Brokenborough and Murray harm, including severe emotional distress and loss of wages.

248.     Accordingly, Defendants have violated Plaintiffs' rights protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

**COUNT IV**
**VIOLATION OF TITLE VII**
**(Hostile Work Environment)**
**(Plaintiffs Brokenborough, Thomas, Murray, Richardson, and Webb-Bridges v. Defendant District of Columbia)**

249.     Plaintiffs Brokenborough, Thomas, Murray, Richardson, and Webb-Bridges reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

250.     Plaintiffs, female employees of the DOC, are members of a protected class.

251.     Supervisors at DOC, in particular Defendant Joseph Pettiford and Lieutenant Marion Kirkland, made unwelcome and unwanted sexual advances and sexual comments to Plaintiffs because of their sex.

252.     These actions were sufficiently severe or pervasive as to alter the terms, conditions and privileges of employment, and to create an abusive, intimidating, hostile and offensive working environment for Plaintiffs.

253.     The unwelcome sexual advances made by supervisors, Defendants and their agents toward Plaintiffs constitute sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

254.     Defendant Pettiford and Defendants' agents were acting within the scope of their employment when they sexually harassed Plaintiffs and the harassment took place in the workplace during working hours.

255.     Defendant Pettiford had the authority to take tangible adverse actions against Plaintiffs.

256.     Defendants had actual and constructive knowledge of the sexual harassment perpetrated against Plaintiffs and refused to take remedial action.

257.     Defendants' discriminatory practices have caused Plaintiffs harm, including severe emotional distress.

258.     Accordingly, Defendants have violated Plaintiffs' rights protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

### COUNT V
### VIOLATION OF TITLE VII
### (Retaliation)
### (Plaintiffs Brokenborough, Thomas, and Murray v. Defendant District of Columbia)

259.     Plaintiffs Brokenborough, Thomas, and Murray reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

260.     Plaintiffs opposed unlawful employment practices by objecting to Defendants' sexual advances and sexual comments, filing internal complaints of sexual harassment and filing

charges with fair employment agencies.  Other employees also opposed unlawful employment practices by reporting harassment to supervisors and supporting the filing of charges.  Such activities are protected under 42 U.S.C. § 2000e-3**.**

261.    Following such actions, Plaintiffs and other employees have faced actions such as denied promotions, unfavorable or dangerous post assignments, denial of overtime hours, and unwarranted disciplinary action, including termination.  These actions constitute retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3.

262.    Defendant Joseph Pettiford and other supervisors were acting within the scope of their employment when they retaliated against Plaintiffs Brokenborough, Thomas, and Murray and other employees.

263.    Defendants' discriminatory practices have caused Plaintiffs harm, including severe emotional distress.

264.    Accordingly, Defendants have violated Plaintiffs' rights protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3.

**COUNT VI**
**VIOLATION OF DCHRA**
(*Quid Pro Quo* **Sexual Harassment**)
**(Plaintiffs Murray, Brokenborough, and Massey v. Defendant District of Columbia)**

265.    Plaintiffs Murray, Brokenborough, and Massey reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

266.    Plaintiffs Murray, Brokenborough, and Massey, female employees of the DOC, are members of a protected class.

267.    Supervisors at DOC, in particular Defendant Joseph Pettiford, made unwelcome and unwanted sexual advances and sexual comments to Plaintiffs Murray, Brokenborough, and Massey because of their sex.  Defendants conditioned Plaintiffs' receipt of job benefits on their

acquiescence to those sexual advances.  When Plaintiffs refused to acquiesce, they suffered

tangible adverse employment actions.

268.    The unwelcome sexual advances made by Defendants and their agents toward

Plaintiffs Murray, Brokenborough, and Massey constitute sexual harassment in violation of the

DCHRA, D.C. Code § 2-1402.11, *et seq.*

269.    Defendant Pettiford and Defendants' agents were acting within the scope of their

employment when they sexually harassed Plaintiffs.

270.    Defendants had actual and constructive knowledge of the sexual harassment

perpetrated against Plaintiffs and refused to take remedial action.

271.    Defendants' discriminatory practices have caused Murray, Brokenborough, and

Massey harm, including severe emotional distress and loss of wages.

272.    Accordingly, Defendants have violated Plaintiffs' rights protected by the

DCHRA, D.C. Code § 2-1402.11, *et seq.*

**COUNT VII**
**VIOLATION OF DCHRA**
**(Hostile Work Environment)**
**(Plaintiffs Murray, Brokenborough, Richardson, Webb-Bridges, and Massey v. Defendant**
**District of Columbia)**

273.    Plaintiffs Murray, Brokenborough, Richardson, Webb-Bridges, and Massey

reallege and incorporate by reference each and every allegation in the preceding paragraphs as if

fully set forth herein.

274.    Plaintiffs Murray, Brokenborough, Richardson, Webb-Bridges, and Massey,

female employees of the DOC, are members of a protected class.

275.     Supervisors at DOC, including but not limited to Defendant Joseph Pettiford, and other superior officers made unwelcome and unwanted sexual advances and sexual comments to Plaintiffs because of their sex.

276.     These comments were sufficiently severe or pervasive as to alter the terms, conditions and privileges of employment, and to create an abusive, intimidating, hostile and offensive working environment for Plaintiffs.

277.     The unwelcome sexual advances made by supervisors, Defendants and their agents toward Plaintiffs constitute sexual harassment in violation of the DCHRA, D.C. Code § 2-1402.11, *et seq.*

278.     Defendant Pettiford and Defendants' agents were acting within the scope of their employment when they sexually harassed Plaintiffs and the harassment took place in the workplace during working hours.

279.     Defendants had actual and constructive knowledge of the sexual harassment perpetrated against Plaintiffs and refused to take remedial action.

280.     Defendants' discriminatory practices have caused Plaintiffs harm, including severe emotional distress.

281.     Accordingly, Defendants have violated Plaintiffs' rights protected by the DCHRA, D.C. Code § 2-1402.11, *et seq.*.

**COUNT VIII**
**VIOLATION OF DCHRA**
**(Retaliation)**
**(Plaintiffs Murray and Brokenborough v. Defendant District of Columbia)**

282.     Plaintiffs Murray and Brokenborough reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

283.     Plaintiffs Murray and Brokenborough opposed unlawful employment practices by objecting to Defendants' sexual advances and sexual comments, filing internal complaints of sexual harassment and filing charges with fair employment agencies.  Other employees also opposed unlawful employment practices by reporting learned harassment to supervisors and supporting the filing of charges.  Such activities are protected under the DCHRA, D.C. Code § 2-1402.11, *et seq.*

284.     Following such actions, Plaintiffs and other employees have faced actions such as denied promotions, unfavorable or dangerous post assignments, denial of overtime hours, and unwarranted disciplinary action, including termination.  These actions constitute retaliation in violation of the DCHRA, D.C. Code § 2-1402.11, *et seq.*.

285.     Defendant Joseph Pettiford and other supervisors were acting within the scope of their employment when they retaliated against Plaintiffs and other employees.

286.     Defendants had actual and constructive knowledge of the sexual harassment perpetrated against Plaintiffs and refused to take remedial action.

287.     Defendants' discriminatory practices have caused Plaintiffs harm, including severe emotional distress.

288.     Accordingly, Defendants have violated Plaintiffs' rights protected by the DCHRA, D.C. Code § 2-1402.11, *et seq.*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.     Declare that the practices described in this Complaint exist at the DOC and that they are unlawful;

2.      Issue a permanent injunction prohibiting Defendants, their officers, agents, employees, and successors from engaging in the discriminatory employment practices complained of herein;

3.      Award Plaintiffs back pay and other job benefits sufficient to redress the harms that they have suffered;

4.      Award Plaintiffs compensatory damages sufficient to redress the harms that they have suffered;

5.      Award Plaintiffs appropriate punitive damages;

6.      Award Plaintiffs reasonable attorneys' fees and costs;

7.      Award any relief necessary to prevent future sexual harassment and retaliation, and to ensure that sexual harassment and retaliation complaints are fully and fairly adjudicated; and

8.      Award any other relief this Court may deem just and proper;

## JURY DEMAND

Plaintiffs demand trial by jury on all counts of the Complaint.

Dated:  May 1, 2014

Respectfully submitted,

 _/s/ Alice Hwang_____

| | |
|---|---|
| Matthew K. Handley (No. 489946) | Ken Chernof (No. 434501) |
| Dennis A. Corkery (No. 1016991) | Amy Likoff (No. 989423) |
| Washington Lawyers' Committee for | Adriane Theis (No. 999689) |
| Civil Rights and Urban Affairs | Alice Hwang (No. 1010190) |
| 11 Dupont Circle NW | Arnold & Porter LLP |
| Suite 400 | 555 12th St NW |
| Washington, DC 20036 | Washington, DC 20004 |
| (202) 319-1000 | (202) 942-5000 |

*Counsel for Plaintiffs Massey, Murray, Richardson and Webb-Bridges*

54

_/s/ Jeffrey Huvelle_
Jeffrey Huvelle (No. 227769)
Brandon Etheridge (No. 1011010)
Covington & Burling LLP
1201 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 662-6000

*Counsel for Plaintiff Thomas*

_/s/ Arjun Garg_
Arjun Garg (No. 975335)
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington, D.C. 20005
(202) 879-5225

*Counsel for Plaintiff Brokenborough*