# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| BROKENBOROUGH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 13-cv-1757 (TSC) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Charnita Thomas brings this suit under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983 for sexual harassment and retaliation.  (Am. Compl. ¶¶ 233–41, 249–64). Defendants District of Columbia and Pettiford both moved for summary judgment.  (ECF Nos. 104, 107).  Upon consideration of the District's and Pettiford's motions, and Thomas's opposition, and for the reasons set forth below, the court GRANTS IN PART and DENIES IN PART the District's motion and DENIES Pettiford's motion.

## I.    FACTUAL BACKGROUND

Charnita Thomas has been a corrections officer with the DOC since November 2006. (Am. Compl. ¶ 8).  Defendants are the District of Columbia and Joseph Pettiford, a Major and former Deputy Warden at the DOC.  (*Id.* ¶¶ 10–11).  Thomas, who began this suit with five co-plaintiffs who have since settled, alleges that in the years since she began working for the DOC, she experienced continuous abuse in the form of sexual comments, propositions, and advances, followed by acts of retaliation when she refused and complained.

Thomas alleges that this years-long pattern of sexual harassment began shortly after she began working at the DOC, in February or March 2007, when Pettiford summoned her to his

1

office and asked her to close the door, then stood close enough so that his stomach touched her

belt buckle and said "I've been watching you through the cameras" and "you bad as shit.  I want

you.  Everybody wants you.  Now, when are you going to stop faking that shit and let me climb

between the sheets and get it in?"  (Thomas Dep. (Pl. Ex. 2) at 96:16–97:2, 100:2–19).  She

rejected Pettiford's sexual advance and left his office.  (*Id.* at 100:2–22).  Afterwards, she felt

shocked, numb, and scared, particularly because Pettiford was her supervising officer at the

DOC.  (*Id.* at 100:12–19).  In Thomas's words, "he's supposed to be [the] one that I go to for

help if something were to happen like this," so "who could I go to?"  (*Id.* at 101:15–17).

A few weeks later, according to Thomas and Ja'net Sheen, another officer, Pettiford

stopped the two of them in a hallway and told them to call in sick the next day so he could "see

[them] get it in" and "join in."  (*Id.* at 110:2–8; Sheen Dep. (Pl. Ex. 14) at 31:21–32:8).  Pettiford

also told Thomas "if we were together, me and you, we would be dangerous," and told Sheen

"you bowlegged, I'm sure [your fiancé] digs into that pussy very well."  (Thomas Dep. at

109:19–21, 110:2–4; Sheen Dep. at 32:2–4).  Both Thomas and Sheen state that they walked

away after these comments and felt scared, so they decided to tell no one about the incident.

(Thomas Dep. at 111:2–4, 115:16–19, 111:10–21; Sheen Dep. at 32:17–33: 8).

Following these encounters, Thomas avoided signing up for overtime shifts in order to

avoid being close to Pettiford's office in the command center (Thomas Dep. at 117:12–120:5),

and eventually she requested and received a transfer to the Juvenile Annex in a different building

(Am. Compl. ¶¶ 82, 86–87).  Thomas alleges that despite her efforts to avoid him, Pettiford

continued to make visits to her post "on a regular basis," and would put his hands on her

shoulders and caress her back.  (Thomas Dep. at 117:12–118:5; 120:3–4; 127:6–10, 8–19;

129:6–130:8; 126:13–15).  He also allegedly repeatedly whispered into her ear comments such as

"you gonna make this hard for yourself" and "[y]ou know what's up."  (*Id.* at 122:3–18).  These incidents continued for years, and Thomas offered as a recent example that in May or June of 2012 Pettiford went to her post in the Juvenile Annex while she was wearing a sweater wrapped around her waist.  Pettiford said "you need to move that sweater and drop it like it's hot."  (*Id.* at 126:5–8).  Four other female officers describe similar incidents.  (*See* Sheen Aff. (Pl. Ex. 15); Nipper Aff. (Pl. Ex. 23); Fields Aff. (Pl. Ex. 22); Nelson Aff. (Pl. Ex. 4)).  Moreover, when asked during his deposition whether he has ever violated DOC's sexual harassment policy, Pettiford replied "I probably have."  (Pettiford Dep. (Pl. Ex. 3) at 91:20–94:22).

Thomas also alleges harassment from Sergeant Sheila Marr and Sergeant Goldman Kinsey.  Thomas alleges that in December 2007, Marr called to her, "[T]here go my baby . . . that uniform don't do Thomas . . . no justice."  (Thomas Dep. at 134:3–19, 135:6–11).  Thomas alleges that Marr periodically made other comments, including "you don't know what you're missing" and "I can make you feel better than a man" and "don't knock it until you try it—you just might like it."  (District Ex. B at 4).  Most recently, in July 2013, Thomas states that Marr told her to "smack it, flip it, rub it down," which she interpreted to be referring to her genitals.  (Thomas Dep. at 162:1–5; District Ex. B at 4).  Thomas recalls that in April 2013, Kinsey told her that he, unlike her then-boyfriend, was "big and thick."  (Thomas Dep. at 196:13–18, 198:4–9; District Ex. B at 4).  He also made comments to Thomas such as "you know I always wanted you" and "you've always been my baby."  (District Ex. B at 4).

These incidents went unreported for several years because, according to Thomas, she felt that filing a complaint would leave her physically unsafe, and because the senior officers shared information about complaints and stuck together, so she "didn't trust anybody."  (Thomas Dep. at 121:15–20).  In September 2012, she informed the DOC Office of Internal Affairs about the

harassment during an interview.  (Am. Compl. ¶¶ 91–92; Def. Ex. 10).  Her complaint was

referred to PREEMPT Corp., the external entity with which DOC contracts to investigate

allegations of sexual harassment.  (*Id.* ¶ 95; District Ex. P, R).  Thomas also filed a charge of

discrimination with both the D.C. Office of Human Rights ("DCOHR") and the U.S. Equal

Employment Opportunity Commission ("EEOC") in August 2012.  (Def. Ex. D, B).  In August

2013, the EEOC issued its Dismissal and Notice of Right to Sue letter for Thomas's 2012 charge.

(Def. Ex. G).  Thomas commenced this suit in November 2013, and later amended her complaint

in May 2014.  Thomas filed an additional charge with the DCOHR and EEOC in November

2014 and received her Right to Sue letter, and she filed another charge in June 2015.  (Def. Exs.

H, I).

Thomas alleges that after she lodged her first complaint in 2012, she experienced

retaliation from those she accused of harassment and others in the DOC, including Sergeant

Kinsey and Major Pettiford.  (Thomas Dep. at 200:12–201:2; District Ex. C at 5; July 22 e-mail

chain, DC-000501 (Pl. Ex. 16); August 2, 2013 e-mail chain, DC-01036 (Pl. Ex. 17); Am.

Compl. ¶ 100).  She contends that due to the harassment and retaliation, she experienced intense

stress and anxiety.  She was diagnosed in July 2012 with acute stress disorder, insomnia, and

anxiety by Dr. Philip Briley, who recommended that she "be assigned to a supervisor she feels

safe with."  (Pl. Ex. 35).  Thomas was also treated by Dr. Reginald Biggs, a psychiatrist, between

August 2012 and November 2014 for "frequent and severe anxiety and depression" and

"persistent insomnia with psychomotor retardation and depressed mood."  (Pl. Ex. 19).  Thomas

took several leaves of absence from her employment, including for eight to ten months in 2013,

allegedly due to her stress, anxiety, concern for her safety, and to avoid continued harassment or

retaliation.  (Thomas Dep. at 73:1–74:17).  In May 2015, Thomas was diagnosed by Dr. Lisa

Piechowski, a psychologist, with psychological distress consistent with a diagnosis of post-traumatic stress disorder.  (Piechowski Dep. (Pl. Ex. 20) at 23:18–21).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no disputed genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  The movant must rely on record materials to demonstrate the absence of any genuinely disputed issues of material fact.  Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 332.  The nonmoving party, in response, must present her own evidence beyond the pleadings to demonstrate specific facts showing that there is a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 324.  A fact is material if "a dispute over it might affect the outcome of a suit," and an issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).  The non-movant is "required to provide evidence that would permit a reasonable jury to find" in his or her favor.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (citations omitted).

## III.    DISCUSSION

### A.  Hostile Work Environment Claims

Thomas alleges that both the District of Columbia and Pettiford are liable for creating a hostile work environment.  Her claims against the District arise under Title VII and 42 U.S.C. §

1983, and her claims against Pettiford arise only under § 1983.  (*See* Am. Compl. ¶¶ 233–41

(Count II –§ 1983), 249–58 (Count IV – Title VII)).

      1.   Exhaustion of Administrative Remedies

The District (though not Pettiford) argues that it is entitled to summary judgment on

Count IV because Thomas failed to timely exhaust the necessary administrative remedies before

bringing suit.  Title VII requires an aggrieved individual to first file a charge with the EEOC and

local agency within 300 days of the unlawful employment practice before bringing suit.  42

U.S.C. § 2000e-5(e)(1), (f)(1); *Lewis v. City of Chicago*, 560 U.S. 205, 210 (2010) ("Before

beginning a Title VII suit, a plaintiff must first file a timely EEOC charge.").  The failure to

exhaust administrative remedies under Title VII is an affirmative defense, so the District must

establish by a preponderance of the evidence that Thomas failed to exhaust her remedies.  *See*

*Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1058 n.3 (D.C. Cir. 1988) (MacKinnon, J.,

concurring) (citing *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985)).

The District first argues that Thomas's EEOC charge fails to explicitly allege a hostile

work environment claim.  It notes that the charging document for her August 2012 claim only

checks the box for "retaliation" and "lack[s] the words 'hostile work environment,'" and

therefore the 2012 EEOC process only exhausted the administrative remedies as to Thomas's

retaliation claim.  The District further argues that Thomas's November 2014 EEOC charge,

which alleges ongoing sexual harassment dating back to March 2007, may only serve to timely

exhaust those allegations that occurred no more than 300 days prior to the charge.  Finally, the

District argues that the 2012 charging documents are defective because they state that the

discrimination began and ended on October 2, 2012, suggesting the complaint was spurred by an

isolated incident, rather than ongoing harassment.

The primary purpose of the exhaustion requirement is to provide the EEOC and defendants with sufficient notice to begin the investigative process. *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citations omitted). Therefore, the exhaustion requirement "should not be construed to place a heavy technical burden on individuals untrained in negotiating procedural labyrinths." *Id.* (quoting *Loe v. Heckler*, 768 F.2d 409, 417 (D.C. Cir. 1985) (internal quotation marks omitted). Because exhaustion is not "a mere technicality," however, a plaintiff's claims in her subsequent Title VII suit are "limited in scope to claims that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Id.* (quoting *Cheek v. W. and S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)) (citation and internal quotation marks omitted). In *Park*, the D.C. Circuit found that the plaintiff had not exhausted her claim because her EEOC charge failed to mention a hostile work environment claim and also lacked "any factual allegations supporting such a claim." *Id.* at 908. Therefore, while plaintiffs need not "use any magic words in a charge much less the specific term 'hostile work environment' in order to properly exhaust a claim," *Whorton v. WMATA*, 924 F. Supp. 2d 334, 348 (D.D.C. 2013) (citations omitted), they must allege some facts to put an employer and the EEOC on notice.

While it is true that Thomas's 2012 EEOC charge checked only the box for "retaliation" and did not check the box for discrimination, and she stated that the underlying conduct began and ended on October 2, 2012 (Def. Ex. D), these defects are not fatal. Thomas wrote in the narrative section of the charge that "[f]or several years, I was subjected to unwelcome comments of a sexual nature by Respondent's [sic] Sergeant (Female) and Major (male)," and "in June 2012, I filed a sexual harassment complaint against Respondent's [sic] Major (male), with Internal Affairs." (*Id.*). While lacking detail, Thomas's charge clearly gives notice that she

alleged sexual harassment and that it had been ongoing for years.  That the District in fact had

such notice is evidenced by a December 2012 DCOHR letter to Thomas, in which DCOHR

wrote that according to DOC "[t]he employees charged by Complainant deny the allegations that

they sexually harassed Complainant."  (Pl. Ex. 38).  Further, though Thomas specified on the

EEOC charging document that the conduct began and ended on October 2, 2012, she had

initiated her EEOC complaint three months earlier in August 2012.  The District therefore had

clear notice that the October 2, 2012 date on the charging document was likely an error and that

the actions forming the basis of the complaint must have pre-dated October 2, 2012.

While Thomas could have been more thorough in her formal charge, she was not required

to use any "magic words" to give notice of her claims.  Based the facts alleged in her charging

documents, the court finds that a claim of hostile work environment could be plausibly inferred,

and therefore the District has not established by a preponderance of the evidence that Thomas

failed to sufficiently exhaust the administrative process as to this claim.  The District's motion is

therefore denied as to exhaustion of administrative remedies.

## 2. *Prima Facie* Case of Sexual Harassment

Defendant Pettiford (though not the District) argues that Thomas has failed to establish a

*prima facie* case of sexual harassment under Title VII.  To demonstrate a *prima facie* case,

Thomas must show that:  (1) she was a member of a protected class; (2) she was subjected to

unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the

harassment affected a term, condition, or privilege of her employment.  *Richardson v. Petasis*,

160 F. Supp. 3d 88, 123 (D.D.C. 2015).  Pettiford concedes that Thomas has met the first and

third elements.

8

### a.   *Unwelcome Sexual Harassment*

Thomas must establish that the comments and actions by Pettiford and others were unwelcome.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986).  The court's analysis focuses on "whether respondent by her conduct indicated that the alleged sexual advances were unwelcome. . . ."  *Id.*  Pettiford asserts that Thomas "never represented that Mr. Pettiford's alleged conducted was unwelcome" and that she "would simply walk away."  (Pettiford Mem. at 21).  However, Thomas testified in her deposition that, during the very first encounter with Pettiford, shortly after she was hired, "I left — I said, no. I said, I can't do this. I said, no." (Thomas Dep. at 100:18–19; 104:8–12).  In addition to directly rejecting Pettiford's advances and walking away, she additionally requested reassignment to a different building of the jail, and she went out of her way to avoid contact with him, including leaving her post when he was near and taking leave from work.  (Thomas Dep. at 117:12–120:5; Am. Compl. ¶¶ 82, 86–87; Thomas Dep. at 73:1–74:17).  Pettiford presented no evidence to support his argument that his sexual advances were not unwelcome, and in light of Thomas's presented evidence, the court therefore finds that Pettiford is not entitled to summary judgment on this issue.

### b.   *Severe or Pervasive Harassment*

Thomas must also establish that Pettiford's conduct was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Meritor*, 477 U.S. at 67 (citation and internal quotation marks omitted).  Pettiford's conduct must be more than "merely offensive."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (Title VII not a "general civility code"). The court must consider the totality of the circumstances, the frequency of the conduct, the severity of the allegations, and whether it unreasonably interfered with Thomas's work

performance.  *See Harris*, 510 U.S. at 23.  In particular, the court must give "careful

consideration of the social context in which particular behavior occurs and is experienced by its

target."  *Oncale*, 523 U.S. at 81.

As detailed above at pages 2–3, Thomas alleges that she experienced years of sexual

advances, lewd comments, comments on her body and her clothing, and repeated caressing and

touching from Pettiford and others.  She reported to the DOC investigator that "between

February 2007 and June 2012 . . . every time he saw her," Pettiford would say things such as

"stop faking, you're missing out," (Pettiford Ex. 15 at 5), and she testified that Pettiford

frequently came to her post in the Juvenile Annex and put his hand on her shoulder and caressed

her back.  (Thomas Dep. at 126:13–15).  She further alleged in her Amended Complaint that

Pettiford "propositioned her on approximately a weekly basis."  (Am. Compl. ¶ 82).  Thomas's

allegations of Pettiford's continuous harassment over a five-year period are also supported by the

testimony of five other former co-plaintiffs in this case who describe being subjected to similar

treatment by Pettiford.[1]  Incredibly, when asked in his deposition if he had ever engaged in

inappropriate sexual behavior in violation of DOC's sexual harassment policy, Pettiford himself

responded "I probably have."  (Pettiford Dep. at 91:20–94:22).

Evidence in the record further supports Thomas's contention that she was seriously

impacted by Pettiford's continuous conduct.  She stated that felt shocked, numb, and scared.

---

[1]  *See* Pl. Exs. 15 (Sheen Aff.) (stating she had experienced "ongoing" harassment from
Pettiford); Pl. Ex. 10 (Brokenborough Dep.) at 177:22–178:7 ("[H]e zipped down his pants and
he proceeded to ask me, you know you want this and I want you to suck, suck me off.  And he
started pulling his penis and ejaculating which was, and he just started, kept doing it, kept doing
it until he ejaculated all over the place."); Pl Ex. 12 (Massey Dep.) at 186–89 (describing quid
pro quo sexual relationship with Pettiford); Pl. Ex. 13 (Murray Dep.) at 88:13–18 (stating that
Pettiford requested photos of her breasts); Pl. Ex. 23 (Nipper Aff.) (describing numerous requests
for sex by Pettiford, including his statement that she would receive a negative performance
evaluation for not having sex with him); Sheen Dep. at 51:8–9.

(Thomas Dep. at 100:12–13).  She also stated that she avoided signing up for overtime shifts because to do so meant being close to Pettiford's office in the command center.  (*Id.* at 117:12–120:5).  Thomas further alleged in her Amended Complaint that she requested and received a transfer to the Juvenile Annex, one building away from Pettiford's, in 2010 because she "believed that the harassment might stop if she distanced herself from Defendant Pettiford," and she would continue to try to avoid him at work if she learned that he was coming towards her post.  (Am. Compl. ¶¶ 86, 87; Thomas Dep. at 127:6–10).  Finally, she sought therapy and counseling to cope with the stress and fear of her work, and took leaves of absence "due to safety issues and fear of my life and the threats."  (Thomas Dep. at 73:1–74:17).

In sum, the record evidence paints a picture of long-term, continuous sexual harassment on a regular basis, far beyond the three discrete incidents Pettiford mentions in his motion.  In light of this evidence, Pettiford's motion with regard to Thomas's prima facie case of hostile work environment is denied.

### 3. *Faragher-Ellerth* Affirmative Defense

To prevail on her hostile work environment claim, there must also be "a basis for holding the employer liable."  *Johnson v. Shinseki*, 811 F. Supp. 2d 336, 345 (D.D.C. 2011) (citations omitted).  Thomas alleges that the District is vicariously liable for the harassing acts of her supervisors, including Pettiford.  The District asserts an affirmative *Faragher-Ellerth* defense, which "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807

(1998).  The District has the burden at trial to establish both elements by a preponderance of the

evidence.  *Id.* (citing Fed. Rule Civ. Proc. 8(c)).

a.  *Exercise of Reasonable Care to Prevent Harassment*

To avoid liability, an employer must exercise reasonable care to promptly prevent and

correct sexual harassment in the workplace.  An employer can satisfy this element by

maintaining an effective anti-harassment policy that informs employees how to report allegations

of harassment and conducting prompt investigations pursuant to this policy.  *See Taylor v. Chao*,

516 F. Supp. 2d 128, 134–35 (D.D.C. 2007).  In accordance with the injunctive relief awarded by

the district court in the sexual harassment class action lawsuit *Neal et al. v. District of Columbia*,

No. 93-cv-0242 (RCL) and as part of a consent decree, the District in 2004 established a written

policy prohibiting sexual harassment and establishing procedures for reporting and investigating

complaints of harassment.  (District Exs. K, L, M).  The District relies on the existence of this

policy to establish the first prong of the *Faragher-Ellerth* defense.  However, the existence of an

anti-harassment policy may not be, by itself, sufficient, since an employer must exercise

reasonable care to "prevent *and promptly correct*" alleged sexual harassment.

Here, the record shows that the District's investigation lasted nearly fifteen months,

between September 5, 2012 and November 23, 2012 (District Ex. P), that despite a cease-and-

desist order prohibiting contact between Pettiford and Thomas (District Ex. Q), Pettiford

continued to visit Thomas's post to make sexual advances, that Sergeant Kinsey told other

supervisors and staff members about Thomas's allegations against Pettiford, including about the

cease-and-desist order (District Ex. R), and that no further efforts were made to protect Thomas

from retaliation from her supervisors.  In light of this evidence and under these circumstances,

the District cannot rely on the mere existence of a policy to satisfy the first prong of the

*Faragher-Ellerth* defense, as the policy's effectiveness and the investigation's promptness are in dispute. The District is therefore not entitled to summary judgment as to the first element of this defense.

### b. *Reasonable Failure to Take Advantage of Preventive Opportunities*

The second prong of the *Faragher-Ellerth* defense requires the District to show that Thomas failed to reasonably take advantage of its anti-harassment procedures. The District argues that because Thomas delayed filing a complaint for years after the harassment began this fact alone "is dispositive of her claim." (District Mem. at 30). Indeed, employers may satisfy their burden with respect to this prong by proffering evidence that a plaintiff delayed for an unreasonable amount of time before availing herself of her employer's anti-discrimination procedures. *See Faragher*, 524 U.S. at 807–08 ("[A]n unreasonable failure to use any complaint procedure provided by the employer . . . will normally suffice to satisfy the employer's burden"); *Taylor v. Solis*, 571 F.3d 1313, 1319 (D.C. Cir. 2009) (delay of five or six months before reporting harassment was unreasonable where there was no credible fear of retaliation).

Thomas argues that her delay was not unreasonable because she credibly feared retaliation for filing a complaint. She testified in her deposition that older officers stuck together, and that telling one supervisor of the harassment would result in them spreading around the information to other officers, leading her to fear for her safety. (Thomas Dep. at 121:15–20). Another officer testified that she knew women who resigned rather than pursue the DOC's complaint process due to the same fear, since in her view "the Department has a practice of retaliating against officers that report misconduct." (Sheen Dep. at 53:10–18). Thomas testified that she took other measures to avoid harm, such as not signing up for overtime because it required being close to Pettiford's office (Thomas Dep. at 117:12–120:5), transferring to a

different building within the jail (Am. Compl. ¶¶ 86–86), leaving her post when she heard

Pettiford was approaching (Thomas Dep. at 127:6–10), and ultimately taking leave from work

(*id.* at 73:1–74:17).  In the court's view, special attention must also be paid to the fact that

Thomas's work as a corrections officer exposed her to constant threats to her physical safety and

she was required to trust her colleagues and supervisors to help keep her safe.  This context

easily makes this case distinguishable from *Taylor*, where the Circuit found no credible fear

because the alleged harasser in that case did not threaten the plaintiff, was not a supervisor, and

"had no leverage at all with which to intimidate" the plaintiff.  571 F.3d at 1318–19.  Moreover,

Thomas alleges that, just as she feared, she did begin to experience retaliation after filing her

complaint, including threats to her safety, and the District was required to issue a cease-and-

desist order against Pettiford and engage in further Internal Affairs investigations into other

supervisors.  (District Ex. Q, R).  Based on this evidence, the District is not entitled to summary

judgment on either prong of its *Faragher-Ellerth* affirmative defense.

      4.   Liability Under Section 1983

Thomas's hostile work environment claim (Count II) against the District and Pettiford is

brought under 42 U.S.C. § 1983 for violating her right to equal protection under the Fifth

Amendment.  (Am. Compl. ¶¶ 233–41).  Both the District and Pettiford seek summary judgment

on this claim, arguing in their motions that Thomas cannot establish liability under § 1983.

      *a.  District of Columbia's Municipal Liability*

To establish the District's liability under § 1983, Thomas must show (1) there was a

"predicate constitutional violation," and (2) that "a custom or policy of the municipality caused

the violation."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing

*Collins v. City of Harker Heights*, 503 U.S. 115, 124 (1992)).  As discussed above in Section

III.A.2, a reasonable fact finder could determine that a hostile work environment existed at the

DOC.  However, the second element requires that a municipal policy have an "affirmative link"

to the alleged hostile work environment "such that [the] municipal policy was the 'moving force'

behind the constitutional violation."  *Baker*, 326 F.3d at 1306 (quoting *City of Canton v. Harris*,

489 U.S. 378, 389 (1989)).  Such a policy may be established by demonstrating that it was

"adopt[ed] through a knowing failure to act by a policy maker of actions by his subordinates that

are so consistent that they have become 'custom' . . . or the failure of the government to respond

to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing

the need will result in constitutional violations," which means "the municipality knew or should

have known of the risk of constitutional violations, an objective standard."  *Id.* at 1306–07

(citations omitted).

 Thomas points to evidence that DOC Director Faust, a policy maker under the test for

liability, "was aware" of ongoing sexual harassment because in September 2013 he fired five

supervisory male employees and publicly stated that the officers had received "repeated

statements" and "warnings" about "creating an intimidating or offensive work environment."

(Thomas Mem. at 32 (citing Pl. Ex. 24)).  Thomas also attempts to show that the District knew

about the ongoing harassment by pointing to a 2016 DOC Office of Investigative Services report

that found significant evidence that a DOC sergeant had "displayed a pattern of lewd and

obscene behavior aimed at female co-workers."  (*Id.* (citing Pl. Ex. 39)).

 When there is no evidence that the District maintains a written policy that itself violates

the constitution, plaintiffs face a "high hurdle" in establishing establish municipal liability.  *Page

v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2014); *see also Robinson v. District of Columbia*,

403 F. Supp. 2d 39, 56 (D.D.C. 2005) (standard is "exacting").  The District argues that

Thomas's proffered evidence undermines, rather than supports, her argument that sexual harassment was so widespread and unchecked as to become adopted as policy by DOC Director Faust because the evidence shows that DOC terminated or disciplined those officers it found to be engaged in harassing behavior.  The court agrees, and finds that Thomas has not proffered sufficient evidence to raise a genuine issue of material fact as to whether the District had a policy or custom of sexual harassment.  Therefore, the court grants the District's motion as to Count II, Thomas's § 1983 claim.

### b. *Pettiford's Personal Liability*

To establish personal liability under § 1983 as to Pettiford, Thomas must show that (1) Pettiford deprived her of a constitutionally protected right and (2) he did so acting under the color of state or D.C law.  *Stoddard v. Wynn*, 68 F. Supp. 3d 104, 111 (D.D.C. 2014) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).  As stated above, a reasonable fact finder could conclude that a hostile work environment existed at DOC and could therefore conclude that Pettiford deprived Thomas of her constitutionally protected right by creating a hostile work environment.  To establish the second element, Thomas testified that Pettiford, as Thomas's supervisor, used his position of authority within the DOC to summon her to his office in 2007 when he allegedly first began to harass her.  (Thomas Dep. at 96:16–97:2, 100:2–19).  Pettiford denies that he had an office in 2007.  (Pettiford Ex. 1 (Pettiford Dep.) at 62:20–64:8).  Thomas further testified that Pettiford would whisper sexually charged comments to her during roll call.  (Thomas Dep. at 122:3–18).  Pettiford testified that since 2009 he has not regularly attended roll call.  (Pettiford Dep. at 73:4–24).  The divergence between Thomas and Pettiford's versions of events is sufficient to create a genuine issue of fact as to whether Pettiford acted under color of law to deprive Thomas of a constitutional right.  *See Jones v. District of Columbia*, 646 F. Supp. 2d 42,

48 (D.D.C. 2009) ("There is most certainly a genuine fact issue as to whether defendant Ellison purported to use his supervisory state authority over plaintiff to lure her to his office and harass her. . . .").

Pettiford raises a potential defense to liability by arguing that he is entitled to qualified immunity, which protects him from being sued in his individual capacity.  To determine whether Pettiford has qualified immunity, the court first decides whether Thomas's allegations, if true, amount to a violation of a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (1999); *Int'l Action Ctr. v. United States*, 365 F.3d 20, 24 (D.C. Cir. 2004).  As already determined above, a reasonable fact finder could determine that Pettiford created a hostile work environment through severe or pervasive sexual harassment in violation of Thomas's Fifth Amendment right to equal protection of the law.  The court must additionally assess whether the right in question was clearly established, in the view of a reasonable officer, at the time of the alleged violation. *Saucier*, 533 U.S. at 201; *Int'l Action Ctr.*, 365 F.3d at 24.  The right to be free from sexual harassment that is severe or pervasive enough to create a hostile work environment is clearly established and has been for decades.  *See Meritor*, 467 U.S. at 67 (citations omitted).  Moreover, the DOC's own anti-harassment policy states that the purpose of the policy is to implement a federal court order regarding sexual harassment at the DOC.  (District Ex. K, L).  Pettiford proffers no evidence or explanation for why a reasonable officer would be unaware of this clearly established right at the time of the alleged violations.

The court therefore concludes that Pettiford is not entitled to summary judgment as to his qualified immunity defense or the issue of his liability under § 1983.

**B. Retaliation Claim**

The District also moves for summary judgment on Thomas's claim under Title VII, which alleges that the DOC[2] retaliated against for complaining about the sexual harassment she experienced.  (Am. Compl. ¶¶ 259–64 (Count V)).

1. Exhaustion of Remedies

As with Thomas's hostile work environment claim, the District first argues that Thomas failed to exhaust her administrative remedies with respect to certain alleged retaliatory acts because she did not include those acts in her EEOC charges.  Under Title VII, "each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).  A party must exhaust administrative remedies "for each discrete act of discrimination alleged or lose the ability to recover for it." *Dudley v. Wash. Metro. Area Transit Auth.,* 924 F. Supp. 2d 141, 155–56 (D.D.C. 2013) (quoting *Lipscomb v. Winter*, 577 F. Supp. 2d 258, 271 (D.D.C. 2008)) (internal quotation marks omitted).  Each discrete retaliatory act is "not actionable if time barred, even when they are related to an act alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113.  Prior to *Morgan*, a plaintiff could "pursue an unexhausted claim if that claim was like or reasonably related to the allegations of an exhausted charge and gr[e]w out of such allegations." *Clark v. Johnson*, No. 14–120, 2016 WL 4742230, at *9 (D.D.C. Sept. 12, 2016) (quoting *Achagzai v. Broad. Bd. of Governors*, No. 14–768, 2016 WL 471274, at *6 (D.D.C. Feb. 8, 2016)) (citation and internal quotation marks omitted).  The D.C. Circuit has not ruled on the specific question of whether, post-*Morgan*, retaliatory acts that are similar to those alleged in an earlier timely EEOC

---

[2]  Thomas raised this claim solely against the District, not against Pettiford.

charge require their own EEOC charges to satisfy this exhaustion requirement.  However, most district court decisions in this circuit have concluded that under *Morgan* subsequent retaliatory acts do require new administrative charges.  *Clark*, 2016 WL 4742230, at *9 (quoting *Achagzai*, 2016 WL 471274, at *6); *but see Hazel v. Wash. Metro. Area Transit Auth.*, No. 02–1375, 2006 WL 3623693, at *6–7 (D.D.C. Dec. 4, 2006) (concluding that *Morgan* does not require separate exhaustion).

In her August 2012 charge, Thomas alleged that she had experienced retaliation, that she "began to feel threatened," that a Sergeant "taunted [her] by laughing loudly and singing, 'I wish I never met her and I didn't know she was like this,'" that an unidentified female voice called her "that old hot bitch," and that Pettiford "came thru [sic] [her] post several times, rolling his eyes, cussing and mumbling under his breath at [her]."  (District Ex. D).  Thomas amended her 2012 charge on October 16, 2012 to include that on October 2, 2012 her shift supervisor informed her that a leave slip was submitted on her behalf by someone else without her permission, and on October 13, 2012, she arrived at work to find out that someone pretending to be her had called to say she would be out sick that day.  (District Ex. E).  In her November 2014 EEOC charge, Thomas alleged that on some unidentified date Sergeant Donald Graham told an inmate to "[g]et [her] fucked up, and fuck [her] up," thus threatening her with physical violence.  (District Ex. H).

Several of the retaliatory acts that Thomas alleges in this suit occurred prior to her 2012 EEOC charges.  She claimed that she experienced retaliation in September 2011 from Sergeant Marr (District Ex. C at 3 (Pl. Supp. Resp. Def. Interrog.)), but this incident occurred more than 300 days before her EEOC charge and would be time-barred even if properly included in the charge.  She also alleges that in June 2012 Pettiford reassigned her to rough posts, including the Northwest-One unit where a riot and stabbings had recently occurred (District Ex. C at 3; Am.

Compl. ¶¶ 85, 100), and in September 2012 an inmate told Thomas that he knew her name and how to find her address, leading her to believe that a supervisor may have passed her name to inmates (District Ex. C at 6).  Neither of these allegations appear in her 2012 EEOC charge, and therefore Thomas has not exhausted—and can no longer exhaust—these claims.  The District is therefore entitled to summary judgment as to Thomas's failure to exhaust these alleged acts.

Several additional allegations post-date the August 2012 charge but were not properly exhausted.  Thomas alleges that in November 2012 she was assigned to the Northwest-Two unit, which she viewed as dangerous (Ex. C at 3–4); that in April 2013 Kinsey ordered Thomas to remove the restraints from a high-risk inmate, creating a safety risk (*id.* at 5); that in March 2013 her request to change her days off was denied (*id.* at 4); that between June and August 2013 Kinsey "looked for ways" to fire her and wrote her up for being insubordinate (*id.*); that in July 2014 Kinsey told her "Bitch if I lose my fucking job, your kids will be motherless" (*id.* at 6; Pl. Exs. 16, 17); and that in September 2014 after being required to attend medical appointments while "absent without leave" ("AWOL"), she was later threatened with suspension because of the time spent AWOL (Ex. C at 5).  As noted above, the D.C. Circuit has not ruled on whether the *Park* "like or reasonably related" standard for excusing a failure to exhaust subsequent similar retaliatory acts survives *Morgan*.  However, the court need not address that question here, for none of these described acts are like or reasonably related to those described in Thomas's 2012 charge.  The acts alleged in the 2012 charge involved taunting, name-calling, cursing, and submitting false leave requests, while the additional acts alleged above involve assignment to dangerous work posts, placing Thomas in dangerous situations, denying leave requests, receiving reprimands, and being physically threatened.  These allegations are similarly not exhausted by

the November 2014 EEOC charge, which fails to mention any of these incidents.  The District is therefore also entitled to summary judgment as to Thomas's failure to exhaust these alleged acts.

The court concludes that Thomas exhausted her administrative remedies with regard to the retaliatory acts included in her 2012 charge and the threat of physical violence included in her 2014 charge.  Although the District argues that this 2014 charge and allegation are not properly before the court because Thomas failed to amend her complaint to include it, the District cites to no cases or rules in support of its view that a complaint must be amended to include every new factual allegation that arises during the court of litigation, and the court is aware of none.  The purpose of exhaustion, like the purpose of pleadings, is to provide a defendant with notice as to the general allegations and claims, which the District surely received. Therefore, the District is not entitled to summary judgment on the issue of whether the November 2014 charge is properly before the court.

### 2. *Prima Facie* Case of Retaliation

Having determined that Thomas has exhausted only those specific retaliatory acts alleged in her 2012 and 2014 EEOC charges, the court must now decide whether these allegations amount to a *prima facie* case of retaliation.  To prove retaliation, Thomas must show that "she suffered (i) a materially adverse action (ii) because . . . she had brought or threatened to bring a discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008) (citations omitted).  A materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Baird v. Gotbaum*, 662 F.3d 1246, 1249 (D.C. Cir. 2011) (citation and internal quotation marks omitted), and "encompass[es] a broader sweep of actions than those in a pure discrimination claim," *Baloch*, 550 F.3d at 1198 n.4.  Under Title VII's anti-retaliation provision, a plaintiff's claim "is not limited to

discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006).  However, "sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims . . . ." *Baloch*, 550 F.3d at 1999.

The only allegations of retaliation before the court are single incidents of verbal taunts and mocking, eye-rolling and cursing, a forged leave request slip, and an incident in which someone pretending to be Thomas called in sick, and a threat of violence from an inmate.  Of these alleged acts, only the threat of violence alleged in 2014 could constitute a materially adverse action that would dissuade a reasonable worker from making a charge of discrimination.  Therefore, the court grants the District's motion with respect to those retaliatory acts alleged in Thomas's 2012 EEOC charge.  The court denies the District's motion with respect to the alleged retaliation in the 2014 EEOC charge, as there remains a question of fact as to whether this threat was a materially adverse action that was causally related to Thomas's harassment complaints.

## IV.    CONCLUSION

For the foregoing reasons, the District's motion is GRANTED as to Count II (hostile work environment under § 1983), DENIED as to Count IV (hostile work environment under Title VII), and GRANTED IN PART and DENIED IN PART as to Count V (retaliation under Title VII).  Pettiford's motion is DENIED as to Count II.


Date:  February 17, 2017


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge